**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**JOHN DOE, Plaintiff,**

**v.**                                                    **CIVIL ACTION NO. _____**

**UNIVERSITY OF PENNSYLVANIA, et al., Defendants.**

**I.**      **Parties in this complaint:**

A.      List your name, address and telephone number.  If you are presently in custody, include your identification number and the name and address of your current place of confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff          Name _John Doe_
                   Street Address _5424 Amboy Road_
                   County, City _Staten Island, NY_
                   State & Zip Code _New York & 10312_
                   Telephone Number _347-213-3020_

B.      List all defendants.  You should state the full name of the defendants, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant can be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1          Name _University of Pennsylvania. Counsel Office of General_
                         Street Address _FMC Tower at Cira Centre South_
                         County, City _2929 Walnut Street, Suite 400_
                         State & Zip Code _Philadelphia, PA 19104-5099_

# PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYM

Plaintiff, John Doe, moves this Court for leave to proceed in this action under a pseudonym. In support thereof, Plaintiff states:

**1. Nature of the Action** This is an action for **<u>injunctive and declaratory relief</u>** arising from a procedurally deficient academic dismissal from the University of Pennsylvania. The core of this dispute involves Plaintiff's private medical history and the University's failure to accommodate a disability under the Americans with Disabilities Act ("ADA"). There is a strong legal claim under Section 504 of the Rehabilitation Act. Title VI and Title IX  administrative frameworks also apply.

**2. Grounds for Pseudonymity** Plaintiff suffers from **Major Depressive Disorder (MDD)**, a sensitive and private mental health condition. The Third Circuit, in *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011), establishes that a party may proceed anonymously when "the injury litigated against would occur as a result of the disclosure of the party's identity."

**3. Risk of Stigma and Injury** If required to litigate under his true name, Plaintiff's sensitive psychiatric history and the details of his academic grievance would become a matter of permanent public record. Such a disclosure would result in direct exacerbation of Plaintiff's medical condition due to the stress of public exposure. That disclosure itself would constitute the injury being litigated against. When a litigant sufficiently alleges a reasonable fear of severe harm from litigating without a pseudonym, courts should balance the plaintiff's interest and fear against the public's strong interest in the open litigation process, using the framework from Doe v. Provident Life and Acc. Ins. Co., 176 F.R.D. 464 (E.D. Pa. 1997), which Megless expressly endorsed.

The Plaintiff has treated their MDD diagnosis as a highly guarded, private medical fact. Under *Provident Life*, the court looks for a "consistent history" of maintaining secrecy. Because MDD is a clinical condition protected by the highest expectations of medical privacy (and federal statutes such as HIPAA in other contexts), the Plaintiff's efforts to limit this information to a tight circle of medical providers and necessary administrative accommodations demonstrate a clear intent to keep the identity and the condition linked only in confidential settings. The "Disclosure as Injury" Argument: The injury here is the unmasking itself. If the court denies pseudonymity, it effectively destroys the "status quo" of confidentiality that the Plaintiff has meticulously maintained. Because the diagnosis has not been voluntarily "placed in the public square," the forced disclosure via the public docket would be an irreversible harm that cannot be undone by a later judgment.

The Third Circuit has consistently held that medical and psychological information sits at the apex of the "utmost intimacy" hierarchy. MDD is not merely an "embarrassing" fact; it is a sensitive psychiatric condition involving personal struggle, clinical treatment, and potential social stigma. The "Disclosure as Injury" Argument: The argument is not that publicizing the name would be "uncomfortable," but that the act of disclosure is a predatory event. Requiring the Plaintiff to attach their legal name to their psychiatric history forces them to choose between

their right to seek judicial redress and their right to medical privacy. For a litigant with MDD, the psychological toll of public exposure is not a side effect of litigation—it is a direct injury that exacerbates the very condition being disclosed.

**4. Lack of Prejudice to Defendants** Plaintiff is not seeking to hide his identity from the Court or the Defendants. Plaintiff will provide his true identity to Defendants' counsel for the purposes of discovery and litigation. Thus, there is no prejudice to the University in allowing the public-facing record to remain under a pseudonym.

**5. The Public Interest** The public interest in this case—ensuring that universities follow due process and the ADA—does not require the disclosure of Plaintiff's specific identity. Rather, the public interest is served by allowing individuals with mental health disabilities to seek judicial relief without the fear of permanent public "outing" of their condition.

6. While Penn is not a government body in the constitutional sense, **Penn receives substantial federal funding**, and the public interest in monitoring federally funded institutions is somewhat different from suits against purely private parties.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant him leave to proceed under the pseudonym **"John Doe"** and that all future filings in this matter be captioned accordingly.

Plaintiff, John Doe, moves this Court pursuant to Fed. R. Civ. P. 65 and Local Civil Rule 65.1 for a Temporary Restraining Order ("TRO") and Preliminary Injunction.

1. Plaintiff is a doctoral student at the University of Pennsylvania Graduate School of Education ("GSE").
2. Defendants have issued a dismissal notice that effectively terminates Plaintiff's enrollment and research residency.
3. Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures. In the context of higher education/private institutions, the primary contract is the GSE Student Handbook. The institution made a specific promise (e.g., a specific appeal process) and failed to perform. Defendants are also in violation of the Americans with Disabilities Act ("ADA"). There is a strong legal claim under Section 504 of the Rehabilitation Act. Title VI and Title IX  administrative frameworks also apply.
4. Immediate and irreparable harm will result to Plaintiff's career, research, and health if he is removed from the program before this matter can be heard on the merits.

5.  As set forth in the accompanying Memorandum of Law, Plaintiff has a high likelihood of success, the balance of equities favors Plaintiff, and the public interest is served by upholding due process.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter the attached Proposed Order granting the TRO and Preliminary Injunction.

---

**2. Brief / Memorandum of Law**

This argues for the **Four-Factor Standard**.

**I. Likelihood of Success on the Merits**

1)  The university violated under Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act ("ADA").

**Background:**

My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "After receiving Ms. Lauren Rudick's email stating that her office "provides support, advocacy, and intervention on behalf of students" on February 10, my son attended the meeting with Ms. Lauren Rudick [Director of Student Intervention Services] and her colleague [an unidentified colleague of Lauren Rudick, who attended a meeting on February 16, 2026 at approximately 4:00 PM]."

A failure-to-accommodate claim requires: (1) the plaintiff is disabled, (2) the defendant had notice, (3) the accommodation requested was reasonable, and (4) the defendant failed to accommodate. The brief will address these four in the following:

**(1) the plaintiff is disabled.** Plaintiff contacted Disability Services at the Weingarten Center at Upenn, the approximate date of first contact was in January 2025. Plaintiff has been approved for accommodations from Disability Services at the Weingarten Center at Upenn due to his disability

besides MDD since January 2025; the accommodations were granted from Disability Services at the Weingarten Center at Upenn based on a completely separate, distinct disability; it has been **apart from** Plaintiff's MDD (See doc 59 and doc 60).

My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "Prior the meeting date, Ms. Rudick never mentioned in the email that her colleague will also participate and interrogate my son."

**(2) the defendant had notice.** My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "The university was already aware of my son's mental health concerns. On December 23, 2025, my son sent an email to a Penn GSE professor [Seiji Isotani] who is involved in my son's matter, and my son wrote, "I am very emotionally stressed out and feeling unwell." (See doc 57) Also, on December 29, 2025, my son had a scheduled Zoom meeting with Dr. Rand Quinn, who is the chair of Policy, Organizations, Leadership and Systems, but my son cancelled that zoom meeting because my son wrote, "Because I am not feeling well, I am unable to attend the meeting on December 29 at 10 am." (see doc 56 )

My father also wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "Also, on January 29, 2026, my son had a scheduled Zoom meeting with Mr. Chris Kubik Cedeño, who is Director of Academic Affairs at Penn GSE but my son cancelled that zoom meeting because my son wrote on January 28, 2026, "I need cancel our optional informational Zoom meeting scheduled for tomorrow at 12:00 PM as I am not feeling well."

**(3) the accommodation requested was reasonable, and (4) the defendant failed to accommodate.** My father also wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "On February 10, 2026, Ms. Rudick wrote before my son's zoom meeting request, "I'm reaching out because I heard that you are dealing with a very stressful academic situation." (see doc 58) Prior to the in-person meeting, my son requested that the meeting be conducted via Zoom due to his condition, but that request was denied. My son

requested the zoom meeting by email on February 11, 2026 to Ms. Rudick, but she wrote on February 12, "I'd like to meet you in person." (see doc 58) The university failed to provide reasonable accommodations for my son for that meeting. Therefore, my son was discriminated on a disability type basis. The university has violated under Section 504 of the Rehabilitation Act and/or the ADA."

My father also wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "While the formal clinical diagnosis of Major Depressive Disorder was finalized shortly after the February 16 meeting, the University had been under actual notice of the symptoms of this disability for months. Between December 2025 and February 2026, the student disclosed a consistent pattern of being 'unwell' and 'emotionally stressed' to multiple officials, including Dr. Quinn, Mr. Kubik Cedeño, and another Penn GSE professor who is involved in my son's matter. When my son requested Zoom on February 11, my son was seeking a reasonable modification for the very symptoms the University had already acknowledged. By ignoring this request and providing no alternative other than an in-person meeting, the University failed in its duty to accommodate a student they regarded as impaired, a failure that was later confirmed by the formal Major Depressive Disorder diagnosis. Having had my son's request for a Zoom accommodation ignored by an administrator who explicitly acknowledged his 'very stressful' state, my son felt he had no alternative but to attend in person to protect his academic standing. While this letter focuses on the specific failures of the February 16 meeting, my son reserves the right to present all evidence regarding his status as a qualified individual with a recognized disability and the University's prior knowledge of his need for accommodations. During the meeting, he expressed that he was under stress, and he requested to end the meeting early. Despite this, questioning continued. After the meeting, my son did not sleep for about 34 hours. On February 18, 2026, my son was diagnosed with Major Depressive Disorder with somatic symptoms and stress-related muscle pain directly linked to the University's recent actions. He has been prescribed daily medication (Duloxetine) and muscle relaxants."

**Establish the Baseline:** Plaintiff was a qualified individual with a disability under the ADA at all relevant times due to a documented learning disability/Neurodevelopmental Disorder formally registered with the Weingarten Center.

**Re-contextualize the Communications:** Plaintiff's December 2025 and January 2026 communications regarding being "unwell" must be viewed through the lens of this existing, known disability—putting the university on notice that its accommodated student was experiencing an escalation of academic barriers.

**Plead in the Alternative (The MDD Timeline):** To the extent that the university claims ignorance of the emerging MDD diagnosis prior to February 18, the university explicitly *regarded* the Plaintiff as substantially impaired during the February 11 interactive dialogue, yet failed to maintain the protections guaranteed under the ADA.

## 2. **The university committed due process violations**

**<u>Unfair termination process from the beginning and violation of Supreme Court precedent</u>** (Goss v. Lopez, 419 U.S. 565 (1975), Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), and Mathews v. Eldridge).

In my appeal letter to "Exceptions to Academic Policies," I wrote, "I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "This termination letter was written by Chair Rand Quinn. Right after about 3 minutes the meeting ended by Zoom on December 18, Katharine forwarded Chair Quinn's letter to my son's email. (see doc 53, 54, 55) Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's discussion. Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story." Also, I was doing homework assigned by my academic advisor, Professor Supovitz, for finding an AI expert during the Fall semester so Professor Supovitz did not get a chance to hear my side of the story." Chair Quinn wrote an email on December 10, before my meeting with Katharine, "I am unavailable to meet next week, so Dean Strunk will meet with you instead. She will be joined by Leslie Levin, Vice Dean of

Admissions and Student Affairs." (See doc 52) During that meeting on December 18, Professor Susan Yoon was there as a witness. Ms. Leslie Levin was not there on December 18. Therefore, "Chair Quinn wrote the termination letter without hearing [my] side of the story," which is a violation of Goss v. Lopez, Board of Curators of the University of Missouri v. Horowitz, and Mathews v. Eldridge. In Goss v. Lopez, the Supreme Court ruled "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  In Board of Curators of the University of Missouri v. Horowitz, due process rights of students in academic dismissal proceedings matters. Furthermore, Mathews v. Eldridge establishes due process rights in academic dismissal proceedings.

In addition, I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "According to my son's recollection, before my son had a chance to say his side of the story to Katharine, Katharine said nothing will change her mind and keep interrupting my son, so my son told her to give him about 5 minutes of uninterrupted time so my son can tell his side of the story."

In my rebuttal letter submitted to Ms. Leslie Levin on March 31, 2026, I wrote, " this is very important. In Professor Quinn's termination letter on December 18, 2025, it stated, "At that time [in May], they voted on whether you should be permitted to continue in the program, and the vote was in favor of dismissal." (See doc 55) This information was not given to me during

that time back in May 2025. I found this out for the first time on December 18, 2025 when I received the official termination letter from Dean Strunk (see doc 55). I wish top administrators could have told me this back in May 2025 instead of the written official termination letter on December 18, 2025 for the first time because I would have 2 research advisors instead of 1 research advisor for the fall semester 2025."

When the decision-maker (Chair Quinn) wrote the termination letter *before* hearing Plaintiff's side, the decision-making process was a sham. It wasn't based on an "individualized assessment" of Plaintiff's progress; it was an arbitrary conclusion reached in a vacuum. If a Ph.D. program at Upenn that is supervised by the Provost office allows other students to respond to "dismissal votes" or provides them with notice of academic concerns before a final vote, but denied Plaintiff that same process, they have applied their policies inconsistently. Under Goss v. Lopez, Board of Curators of the University of Missouri v. Horowitz, and Mathews v. Eldridge, the university is prohibited from reducing Plaintiff to a "file" to be dismissed without the same individualized fairness they afford to others.

On March 10, 2026, My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE, "We request an extension to April 15, 2026, for any response deadlines due to Injun's recent diagnosis with Major Depressive Disorder on February 18, 2026. Medical documentation is attached."

However, **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE wrote on March 12,  "Unfortunately, we cannot accommodate your request for an extension to submit your petition to the Committee on Degrees.  Our Committee has had their meeting date scheduled for quite some time, and this meeting will occur at the end of this month.  Thus, we will need to adhere to the March 15, 2026 (by 11:59 pm) deadline as has been communicated to you." (see doc 50)

My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 30, 2026, "My son will formally respond to "the documents submitted to the Committee on Degrees on behalf of GSE" by Tuesday, March 31. Meanwhile, my son requests "the documents submitted to the Committee on Degrees on behalf of GSE" to include only about 6 weeks of assessments (from around August 28, 2025 to October 29, 2025 ) from Professor Isotani because Right after about 3 minutes the meeting ended by Zoom on December 18, 2025 with Dean Katharine Strunk,  Dean Katharine Strunk forwarded Chair Quinn's email to my son's email; in that letter dated on December 18, 2025, Dr. Quinn included about only 6 weeks of my son's research apprenticeship performance with Professor Isotani (from around August 28, 2025 to October 29, 2025 ); according to Dr. Quinn's letter (December 18, 2025), that was one of his factors for Dr. Quinn's decision. (Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's discussion. Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story. My son will provide email evidence that Chair Quinn and Professor Supovitz were not there on December 18, 2025.) However,  "the documents submitted to the Committee on Degrees on behalf of GSE" that you sent my son on March 20, 2026 includes about 14 weeks of my son's research apprenticeship performance with Professor Isotani; the Committee is looking at evidence that did not exist when the original decision was made by Chair Quinn=The evidence exceeds the scope of the underlying decision (Dr. Quinn's letter dated on December 18, 2025);  "The documents submitted to the Committee on Degrees on behalf of GSE" that you sent my son on March 20, 2026 deviates from the original termination letter's time framework (the original termination letter written by Dr. Quinn's letter dated on December 18, 2025) of about only 6 weeks of my son's research apprenticeship performance with Professor Isotani (from around August 28, 2025 to October 29, 2025)."

My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 30, 2026, "By requesting that the Committee limit its review to the initial about six-week period, my son does not concede the accuracy of those assessments; rather, he is insisting that the Committee adhere to the proper scope of the administrative record. Professor

Isotani's remaining about 6 weeks of the fall semester of 2025 evaluation of my son's research apprenticeship performance  (from after October 29, 2025 to December) was tainted by the Chair Quinn's termination letter dated December 18, 2025, making those evaluations legally unreliable. My son requests  "the documents submitted to the Committee on Degrees on behalf of GSE" to include only about 6 weeks of assessments from Professor Isotani from around August 28, 2025 to October 29, 2025 because that's what Dr. Quinn's original termination letter (December 18, 2025) covers. In Goss v. Lopez, the Supreme Court held that due process requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Here, my son was only on notice of approximately 6 weeks' worth of assessments (Professor Isotani) as forming the basis for the termination. Expanding the evidentiary record to 14 weeks at the appeal stage, without that having been the stated basis for the original decision, raises a fair notice concern."


**Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE wrote an email to Plaintiff on March 26, 2026, "If you would like to submit a response to the documents [rebuttal response that Plaintiff can submit to Penn GSE] that were sent to the Committee on Degrees from GSE, please do so no later than 11:59 pm on Tuesday, March 31ˢᵗ ." (see doc 49).  **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE gave approximately 7 business days for Plaintiff to write the rebuttal response despite Plaintiff having MDD and the Plaintiff had 5 courses (being full time Ph.D. students), and Penn GSE having access to these information about Plaintiff. In Plaintiff's Ph.D. program in his education policy division, only 4 courses for full time Ph.D. students in education policy division are allowed unless a special permission is granted.


The Plaintiff's father wrote that the university was committing due process violations and communicated that by email on March 30, 2026, but **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE wrote an email to the Plaintiff's father after the rebuttal response deadline passed and said Penn GSE will consider 14 weeks, which put Plaintiff at enormous disadvantage in his appeal process;  **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE wrote on April 1, "Dear Injun, I am writing to confirm receipt of your father's email from

Monday, March 30th.  Please note that the totality of your academic performance [14 weeks under Professor Isotani's research] is relevant and appropriate to share with the Committee on Degrees." (see doc 48)

Furthermore, in the plaintiff's appeal letter to Penn GSE, Plaintiff stated, "I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "When the termination letter written by Chair Rand Quinn, he also cites Prof. Isotani's email on October 29, 2025 as a reason to terminate my son from the Ph.D. program. However, based on my son's recollection, Prof. Isotani's email reflects about "one day of research work" with my son; this is insufficient evidence to use to terminate my son from the Ph.D. program. Also, that October 29 email from Prof. Isotani contains material inaccuracies and do not fairly reflect my son's research contributions. Based on my son's recollection, my son has about one year research contract from this fall semester to June 2026 with Upenn, so to use my son's about "one day of research work" with  Prof. Isotani is insufficient." In December 2025, January 2026, February 2026, and before March 20, 2026, regarding Professor Isotani's evaluation toward Plaintiff, Plaintiff had the evaluation of only about "one day of research work" from  Professor Isotani.

Suddenly, on March 20, 2026, **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE gave Plaintiff "the documents submitted to the Committee on Degrees on behalf of GSE" which included approximately 14 weeks of research work with Professor Isotani, and **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE gave approximately 7 business days for Plaintiff to write the rebuttal response despite Plaintiff having MDD and the Plaintiff had 5 courses (being full time Ph.D. students) as mentioned above; this action by Penn GSE is due process violations and  violation of Supreme Court precedent (Goss v. Lopez, 419 U.S. 565 (1975), Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), and Mathews v. Eldridge).

**3) Wrongful termination**

In Plainiff's appeal letter document to the university back in March 2026, Point 2, 12, 13, 15, 18, 19 are considered as evidence of wrongful termination. Attached these points (2, 12, 13, 15, 18, 19) below:

**<u>Point 2</u>**

On June 30, 2025, Professor Weathers pointed out "There were also ongoing challenges related to timely completion of timesheets and preparation for meetings, including difficulties in taking and retaining clear notes to support task completion." I respectfully disagree with those statements. Starting February 12, 2025, Professor Weathers asked for a timesheet on excel spreadsheet (see doc 6). Professor Weathers did not provide me all the necessary information regarding a timesheet on Excel spreadsheet from the beginning via email back on February 12, 2025.Thus, she can't hold me accountable for things on timesheet when she failed to disclose all the necessary information to me from the beginning via email back on February 12, 2025. In that February 12, 2025 email, Professor Weathers attached the sample timesheet, which the format had 4 columns: "date, task description, number of hours, and note (if applicable)" (see doc 6 and doc 9); thus, I sent the timesheet on February 24, 2025 following the exact format such as "date, task description, number of hours, and note (if applicable)" as her attachment showed on February 12, 2025. I did what Professor Weathers asked on a timesheet on excel spreadsheet on February 24, 2025 based on the best available information that she provided at that time on

February 12, 2025. Based on reviewing many emails that I interacted with Professor Weathers, after I sent the timesheet on excel spreadsheet on February 24, 2025 to Professor Weathers, I did not hear back from her after approximately 20 days whether I did the timesheet on excel correctly or not.

On March 19, 2025's email, she mentioned that on March 17, 2025's Zoom meeting, she explained about how to revise the timesheet, but during the Zoom meeting on March 17, 2025, I told Professor Weathers that my laptop crashed, and I am using Van Pelt library's laptop that I borrowed from the library, where the audio of the library's laptop was difficult to hear Professor Weathers' voice. I have the receipt that I borrowed the library's laptop because my laptop crashed on that day of the Zoom meeting with Professor Weathers (see doc 12).

Most importantly, when comparing the information that she gave on February 12, 2025's email (see doc 6 and doc 9) VS the information that she gave on March 19, 2025's email (doc 13), there was new information on March 19, 2025 regarding timesheet on excel (i.e. specific style of wording under "task description" category where she gave new information of how she wanted "task description" category to be described such as "searched for literature", "read literature", and "located and found literature" as her images on her email attachment showed; based on her March 19, 2025 email, she wanted "task description" category to be described into a broad general description instead of going into specific details. When I sent the timesheet on excel spreadsheet on February 24, 2025, I did it based on the best available information that she provided at that time on her February 12, 2025 email, where she did not provide information of how she wanted "task description" category to be described such as "searched for literature", "read literature", and "located and found literature", which were described into a broad general description instead of going into specific details; I did "task description" category  by going into

specific details when I sent the timesheet on excel spreadsheet on February 24, 2025, because I did it based on the best available information that she provided at that time on her February 12, 2025 email.

Also, in her February 12, 2025 email regarding the timesheet on excel, she did not verbally mention that she wants "each tab for the week" regarding timesheets on excel. Based on reviewing many emails that I interacted with Professor Weathers, in a March 19, 2025 email, Professor Weathers for the first time wrote it out verbally that she wants, "each tab for the week" regarding timesheets on excel. After receiving new information from her March 19, 2025 email, approximately within 5 business days, I sent her my updated timesheet on excel by incorporating her recommendations; on March 26, 2025, I wrote to her, "Dear Professor: I attached the timesheet. I incorporated your recommendations" (see doc 10). Bottom line: After Professor Weathers gave me all information on March 19, 2025, I did what she asked on March 26, 2025 (doc 9 and doc 11). As a result, Professor Weathers wrote on March 31, 2025, "Hi Injun, Thanks for revisiting the timesheet. This format looks good. Please keep this up" (see doc 11)

**Point 12**

On June 30, 2025, Professor Weathers pointed out, "When I provided guidance on preparing a brief description of a potential research interest—specifically, a single paragraph outlining a possible topic and its significance—you interpreted this as a request for a dissertation proposal. This misinterpretation, despite clarification, reflects difficulty in accurately understanding and acting on advising guidance." I don't think she is telling the whole story. Professor Weathers' email on March 25, 2025 stated, "For instance, we discussed preparing a

one-sentence research question and a short paragraph explaining its importance so that you could begin connecting with other faculty (you expressed interest in meeting with others) and developing a summer research project of your own. However, that task wasn't completed, and you shared that you intended to approach it differently by meeting with professors first."

On March 25, 2025, I wrote my response to Professor Weathers, "Dear Dr. Weathers: Regarding the Ph.D. dissertation proposal ("one-sentence research question and a short paragraph"), would you give an extension?  Because  as a first year Ph.D. student, I feel that it is too early to write a Ph.D. dissertation proposal. Here are the reasons. On February 28, I mentioned that I have specific research interests: AI in K-12 education, STEM, and how race (maybe) as a variable can play a role in the context of AI in K-12 education and STEM. I have nothing more to add at this moment than what I mentioned on February 28 during your office. In order to write a Ph.D. dissertation proposal, I was told that you need to find a gap in a particular field (in my case, AI in K-12 education and STEM) and what contribution I will make as an academic scholar at the Ph.D. level in this specific field. As a first-year Ph.D. student, I did not take enough education courses at GSE because I have been focused on fulfilling quantitative requirements in the edu policy division. Last semester, I took only 3 courses, and this semester, I am taking only one education course with Dr. Ryan Baker, and the rest of my coursework this semester is all quantitative courses in order to fulfill quantitative requirements in the edu policy division in the Ph.D. program. During my first year in the Ph.D. program, none of the education courses at GSE have so far connected the link between AI in K-12 education and STEM and how race as a variable can play a role in this context. I believe that by next year, I am schedule to take more education courses at GSE that will hopefully connect these dots. Finally, as a first year Ph.D. student, I did not attend the education conference in Washington D.C. this year because I

had a midterm to study. By next Spring 2026, taking more education courses at GSE, attending this education conference in Washington D.C., and speaking with more professors who are experts in STEM and AI in K-12 education can help me to develop a Ph.D. dissertation proposal."

Whether she wants to call it "dissertation proposal" or "summer research project" or "research question," my key takeaways from this email on March 25, 2025 is that she wanted more than just my research areas, and Professor Weathers as my academic advisor should have given more more advanced notice since she knew which courses I was taking the spring semester of 2025. I emailed her my 2 years course schedule and Wharton's master degree schedule in November 2024 so if she wanted "preparing a one-sentence research question and a short paragraph explaining its importance;" If she wanted the things that she stated, which is "For instance, we discussed preparing a one-sentence research question and a short paragraph explaining its importance so that you could begin connecting with other faculty (you expressed interest in meeting with others) and developing a summer research project of your own", then she should have told me to take AI course in education in the spring semester of 2025 instead of quantitative courses in the spring semester of 2025. She put me on the spot without advance notice, which is not fair to me.

**Point 13**

My core issue with my March 17, 2025 Zoom meeting with Professor Weathers is that she did not even let me know during the meeting that our last meeting will be on March 17, 2025. Many of the items that she complaint on her March 25, 2025 email was after our last meeting; so hypothetically speaking, even if these items are true, which they were not, she did not give me time to redeem them, and some of the items that she expressed concerns on her

March 25, 2025 email were inaccurate description of my work with her. On April 2, 2025, she wrote, "Dear Injun, After careful thought and reflection, I have decided to step down as your advisor in the Education Policy program, effective April 2, 2025. I believe this is the best path forward for both of us given the concerns I previously expressed via email and the differences in our research agendas. The fit between advisor and advisee is a crucial aspect of doctoral training. I have discussed this decision with Michael Gottfried, Chair of the Education Policy program, both before and after reaching this conclusion. He is copied here in case you have any questions that I am unable to answer. With this change, you will need to identify a new advisor. Given your broadly stated interests in AI and STEM, I encourage you to reach out to Drs. Bodong Chen, Susan Yoon, and Janine Remillard to explore potential alignment in research interests. They are aware you'll be contacting them and are open to speaking with you. Please note that although these faculty members are not based in the Education Policy program, they are still eligible to serve as your advisor. This change in advising does not affect your current enrollment in the Education Policy program. If you have any questions, would like to talk further, or need more ideas about potential advisors, please don't hesitate to reach out to me or Michael. Wishing you all the best, Ericka" (see doc 27).

**Point 15: Not handle correctly**

I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "This termination letter was written by Chair Rand Quinn. Right after about 3 minutes the meeting ended by Zoom on December 18, Katharine forwarded Chair Quinn's email to my son's email. Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's discussion.

Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story." Also, I was doing homework assigned by my academic advisor, Professor Supovitz, for finding an AI expert during  the Fall semester so Professor Supovitz did not get a chance to hear my side of the story.

**Point 18**

On October 29, 2025, Professor Isotani wrote, "When I share papers with you, I expect that you read them carefully and fully. In our first meeting, I sent several papers on how to conduct systematic literature reviews (SLR) and shared examples of published ones. However, it still seems that you are not fully familiar with the process or the expected deliverables. Please revisit those papers so we can make meaningful progress." The issue that I have with this is that he assigned this assignment on August 29, 2025, which was about 50 days ago from the day he asked which was on October 23, 2025 (see doc 29). When he assigned this on August 29, 2025, he never reviewed them with me. Also, this is not what I agreed to do during my meeting with Professor Isotani; on my email on October 27, 2025 to Professor Isotani's contact person, Nam, I wrote,  "I want to give you an update. Before meeting with Professor Isotani this past thursday, I was planning to follow what we discussed on October 9, which was that I examine titles and abstracts along with keeping 4 strings in mind (string one: ((LLM OR "large language model" OR ChatGPT OR "Google Gemini" OR Gemini OR DeepSeek) string two: ("personalized learning" OR "intelligent tutor" OR "pedagogical agent" OR "virtual agent" OR "smart learning environment") ; string three: (student OR child OR kid OR pupil); strong four: (benefit OR advantage OR drawback OR disadvantage)  from library databases to do a systematic literature review; so, I was planning to submit 10 articles for the week of October 13, and I was also

planning to submit additional 10 articles for the week of October 20. And during the week of October 27, I was planning to submit 30-40 articles using the methods discussed on October 9. However, during the meeting with Professor Isotani this past Thursday, he wants me not to focus on the systematic literature review or the publication. Instead, Professor Isotani wants me to do a literature review with this specific research question that I discussed during this past Thursday's meeting: "Analyzing and categorizing evidence of the benefits and harms of LLMs in teaching and learning (e.g., cognitive offloading, attention loss, decrease in critical thinking, etc.)" (see doc 30). Imagine a professor gives an assignment to students during the first week of class, and never review for more than 50 days and 50 days later test students, and the professor does not let the students know they are being tested on information and surprise his/her students, and whoever do not pass this test, they fail the course. This would not be fair to students. All of Professor Isotani's evaluation is referring to about one meeting on October 23, 2025.

**Point 19**

Also, On October 29, 2025, Professor Isotani wrote, "I also asked you to identify 10 key papers on AI + LLMs + personalized learning that can help to work on the search string for the SLR. You sent us the list, but you were not able to discuss their content in our last meeting (not a single paper)." This was not what Professor Isotani asked me during the meeting on October 23, 2025. Instead, during that meeting, Professor Isotani asked me to synthesize multiple articles on the spot and find common things among them; The major issue that I have with this is that this is not what I agreed to do during my meeting with Professor Isotani; on my email on October 27, 2025 to Professor Isotani's contact person, Nam, I wrote, "I want to give you an update. Before meeting with Professor Isotani this past thursday, I was planning to follow what we discussed on

October 9, which was that I examine titles and abstracts along with keeping 4 strings in mind (string one: ((LLM OR "large language model" OR ChatGPT OR "Google Gemini" OR Gemini OR DeepSeek) string two: ("personalized learning" OR "intelligent tutor" OR "pedagogical agent" OR "virtual agent" OR "smart learning environment") ; string three: (student OR child OR kid OR pupil); strong four: (benefit OR advantage OR drawback OR disadvantage)  from library databases to do a systematic literature review; so, I was planning to submit 10 articles for the week of October 13, and I was also planning to submit additional 10 articles for the week of October 20. And during the week of October 27, I was planning to submit 30-40 articles using the methods discussed on October 9. However, during the meeting with Professor Isotani this past Thursday, he wants me not to focus on the systematic literature review or the publication. Instead, Professor Isotani wants me to do a literature review with this specific research question that I discussed during this past Thursday's meeting: "Analyzing and categorizing evidence of the benefits and harms of LLMs in teaching and learning (e.g., cognitive offloading, attention loss, decrease in critical thinking, etc.)" (see doc 30). Also, during the meeting, he asked to do the powerpoint presentation, but I did not agree to do the powerpoint presentation on October 23, 2025 so he cannot hold me accountable for things I did not agree with.

Also, Professor Isotani does not provide clear instructions as to what he is looking for. Working with Nam who has only a master degree and Professor Isotani together creates difficulties because sometimes they do not align regarding task assignment.

4) **Breach of contract**

Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures (see doc 47). In the context of higher education/private institutions, the primary contract is the GSE Student Handbook. The institution made a specific promise (e.g., a specific appeal process) and failed to perform (see doc 61 under "e. GSE Student Academic Grievance Policy" .

According to Jennifer Reese in 2025, she wrote, "As part of your apprenticeship requirement, I am pleased to appoint you as a research fellow to" Professor Isotani." (see doc 51) According to Merriam-Webster dictionary, the definition of apprenticeship is "a position as an apprentice : an arrangement in which someone learns an art, trade, or job under another." I underline the word "learn" in the definition of apprenticeship because learning is an integral component of research apprenticeship; part of learning includes an opportunity of redeeming if a student did not do it perfectly. Working with professor Isotani, he does not an opportunity of redeeming, especially on October 23, 2025 where he asked several questions that we never agreed to as you see in the previous emails mentioned in my appeal letter, and during the next meeting on November 4, 2025, I recall he did not ask the same questions that he asked on October 23, 2025.

My father wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, 2026, "I need to follow up regarding "GSE Student Academic Grievance Policy." According to "GSE Student Academic Grievance Policy", it says, "A GSE student who wishes to register a grievance on the evaluation of the student's academic work (for example, the appealing of a grade) or an academic matter related to the program or a course should discuss the situation with the faculty member first. If not satisfied, then the student should follow the order below in elevating the issue" (See doc 61)

My father also wrote to **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, 2026, "Most importantly, if the "GSE Student Academic Grievance Policy" only meant coursework, it would say "coursework." By adding "academic matter related to the program" in the "GSE Student Academic Grievance Policy," the policy encompasses the entire ecosystem of a student's degree progress.  (See doc 61) Therefore, my son's case should be considered in "GSE Student Academic Grievance Policy." Also, we are requesting the 4-step Grievance process. "GSE Student Academic Grievance Policy" has 4 steps at Penn GSE so this policy gives my son more opportunity to stay in the Ph.D. program and earn the Ph.D. degree, while "Exceptions to Academic Policies" has one step at Penn GSE. When my son signed "Formal Response and Reservation of Rights" on January 29, 2026, and sent this to your office, under section 4 in "Formal Response and Reservation of Rights," it said, "His objective remains unchanged: to complete the Ph.D. program and earn a Ph.D. degree at Penn GSE." My son maintains that the "Exceptions" track is procedurally inappropriate for a dismissal based on research performance. We participate in the Exceptions track under express protest and without waiving our right to pursue the Grievance Policy track."

Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures. **Leslie M. Levin,** Vice Dean of Admissions and Student Affairs at Penn GSE on April 8, 2026, "Dear Injun, I received your email from Wednesday, April 1st which states that you are initiating Step 3 of the GSE Student Academic Grievance Policy.  As I articulated in both my 3/12/26 and 1/29/26 emails, the appropriate process for addressing your appeal is the Exceptions to Academic Policies process.  The Committee on Degree will review this matter and issue a final determination.  We will be in touch with you once that decision is rendered." (see doc 47).

Also, attached Penn GSE's 4 year funding statement (see doc 43)

**II. Irreparable Harm**

Overview: Academic dismissal is a career-ending event. The loss of unique research collaborations in AI and Education Policy cannot be compensated by money.

**1. The Loss of Unique, Non-Fungible Academic Opportunity**

The Third Circuit has recognized that the loss of a unique opportunity—particularly in a highly specialized academic or professional context—constitutes irreparable harm that money cannot remedy. Plaintiff's research involves the intersection of artificial intelligence, Large Language Models (LLMs), and public policy in education. This work is dependent on specific university resources, including access to high-performance computing clusters and ongoing residency collaborations with faculty members in schools such as but not limited to Graduate School of Education and The Wharton School of the University of Pennsylvania. Plaintiff is in the joint program in Graduate School of Education and The Wharton School. Furthermore, this work is also dependent on ongoing residency collaborations with faculty members in other social science fields since Plaintiff's field is interdisciplinary.

Because Ph.D. research is inherently 'unique' and 'non-fungible,' a mid-stream termination of Plaintiff's enrollment is not merely a delay; it is a destruction of the specific intellectual environment and momentum required to complete Plaintiff's doctoral residency. No amount of future monetary damages can replicate the loss of these specific research windows or the collaborative synergy of Plaintiff's current residency.

## 2. Irreparable Stigma and Career "Death Sentence"

An academic dismissal from a doctoral program is a 'scarlet letter' within the professional and research community. If the University is permitted to finalize the 'Unsatisfactory' performance determination on Plaintiff's permanent transcript while the merits of Plaintiff's grievance are still in dispute, the damage to Plaintiff's professional reputation will be instantaneous and irreversible.

In the competitive field of AI and education research, a record of dismissal effectively bars a candidate from future fellowships, grants, and academic appointments. Even if Plaintiff were to prevail at a trial approximately two years from now, the interim stigma of 'dismissal' would have already permanently altered Plaintiff's career trajectory, making reinstatement a hollow victory."

### III. Balance of Equities

Overview: The hardship to Plaintiff—loss of career and health regression—far outweighs the minor administrative burden of maintaining Plaintiff's enrollment during the pendency of this litigation.

### Exacerbation of Health and "Status Quo" Preservation

The abrupt dismissal—conducted in violation of the University's own grievance procedures—has caused a documented and significant regression in Plaintiff's mental health, specifically  Plaintiff's Major Depressive Disorder (MDD). The Third Circuit has held that the purpose of a Preliminary Injunction is to preserve the *status quo* to prevent further injury.

The *status quo* in this case is Plaintiff's continued enrollment and participation in the research residency. Allowing the University to upend this status quo before a final ruling would subject Plaintiff to a 'risk of health regression' and career displacement that far outweighs any administrative inconvenience to the University. The abrupt and procedurally deficient dismissal has caused a significant decline in Plaintiff's health, specifically exacerbating a documented Major Depressive Disorder (MDD). The ongoing stress of an uncertain academic future poses a risk of health regression that money cannot adequately remedy.

**IV. Public Interest** The public interest favors holding federally funded institutions to their published policies and protecting the rights of students with disabilities. Furthermore, the public has a strong interest in the advancement of ethical AI in education. Permitting the procedurally deficient removal of a researcher in this critical field harms not only the individual but the broader public interest in educational innovation. The "Window of Research" Argument needs to be considered. Since  Plaintiff works with Large Language Models (LLMs) and Deep Learning, emphasize that this field moves at an incredible speed. A one-year delay caused by a wrongful dismissal would render  Plaintiff's current research obsolete. This is "irreparable harm" because time in high-tech research cannot be bought back.

**3. Verified Complaint (Sworn Facts)**

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this __17__ day of __May__ , 20__26__.

Signature of Plaintiff _____

Mailing Address __5424 Amboy Road Staten Island, NY 10312__

Telephone Number __347-213-3020__

Fax Number *(if you have one)* _____

E-mail Address __davex@upenn.edu__

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

## 4. Proposed Order

**ORDER AND NOW**, this ____ day of _____, 2026, it is hereby **ORDERED** that Plaintiff's Motion is **GRANTED**. Defendants are **ENJOINED** from enforcing the dismissal of John Doe and must restore his full academic access. No security bond is required.

## 5. CERTIFICATION OF NOTICE PURSUANT TO FED. R. CIV. P. 65(a)

I, proceeding as John Doe, hereby certify that on **May 17, 2026, at [Time]_about 11:30 PM ET____**, I provided notice of this Motion for a Temporary Restraining Order to the University of Pennsylvania's Office of the General Counsel and an underlying complaint via email to **[Insert Email Address, e.g., wendy.white@ogc.upenn.edu, lee.dobkin@ogc.upenn.edu,Patricia.Colonna@pennmedicine.upenn.edu]**.

A copy of the sent email, including all attachments except fee waiver of the court process fee, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing, [State if they replied or not:].I did not receive the acknowledgement receipt.

Notice should not be further delayed because the University is scheduled to finalize my dismissal and terminate my academic access within about 24 hours business day, and immediate judicial intervention is necessary to preserve the status quo.

**6. Security / Bond (Rule 65(c))**

In the E.D. Pa., I request for a **waived or nominal bond** ($100).

Plaintiff is a student with limited resources. Because the injunction merely maintains the status quo and imposes no financial cost on the University, the Court should waive the bond requirement.

7.

Instead of hearing conducted via live, in-person, or virtual, Plaintiff requests written communication as a formal request for a "Reasonable Accommodation" due to Plaintiff's medical symptoms described. Most importantly, on February 18, 2026, Plaintiff was diagnosed with Major Depressive Disorder with somatic symptoms and stress-related muscle pain. Plaintiff has been taking daily medication Duloxetine and muscle relaxants.