**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**JOHN DOE, Plaintiff,**

**v.**                                                    **CIVIL ACTION NO. 26-CV-3449**

**Katharine O. Strunk, Rand Quinn, Susan A. Yoon, Ericka S. Weathers,  Seiji Isotani, Jonathan A. Supovitz, Michael A. Gottfried, Lauren Rudick, and Leslie M. Levin, Defendants.**

**FIRST AMENDED motion**

I.        **Parties in this complaint:**

A.        List your name, address and telephone number.  If you are presently in custody, include your identification number and the name and address of your current place of confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff        Name        John Doe
                Street Address    5424 Amboy Road
                County, City    Staten Island, NY
                State & Zip Code    New York & 10312
                Telephone Number    347-213-3020

Defendant No. 1

Name _____Katharine O. Strunk _____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone Number_____(215) 898-7014 _____

Defendant No. 2

Name _____Rand Quinn _____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone Number_____(215) 898-9330_____

1

Defendant No. 3

Name _____ Susan A. Yoon_____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone Number_____(215) 746-2526_____

Defendant No. 4

Name _____ Ericka S. Weathers_____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone number:_____NA_____

Defendant No. 5

Name _____ Seiji Isotani_____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone Number_____(215) 898-7488_____

Defendant No. 6

Name _____Jonathan A. Supovitz_____
Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street
State, City, &Zip Code _____Philadelphia, PA 19104 _____
Telephone Number_____(215) 573-0700 x230_____

2

Defendant No. 7

Name _____ Michael A. Gottfried_____

Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street

State, City, &Zip Code _____Philadelphia, PA 19104 _____

Telephone number:_____NA_____

Defendant No. 8

Name _____Lauren Rudick  _____

Street Address : University of Pennsylvania 3935 Walnut Street, Suite 400 _____

State, City, &Zip Code _____Philadelphia, PA 19104 _____

Telephone Number_____215-746-1203  _____

Defendant No. 9

Name _____ Leslie M. Levin _____

Street Address:University of Pennsylvania, Graduate School of Education 3700 Walnut Street

State, City, &Zip Code _____Philadelphia, PA 19104 _____

Telephone Number_____215-898-1501  _____

## PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYM

Plaintiff, John Doe, moves this Court for leave to proceed in this action under a pseudonym. In

support thereof, Plaintiff states:

**1. Nature of the Action** This is an action for **<u>injunctive and declaratory relief</u>** arising from a

procedurally deficient academic dismissal from the University of Pennsylvania. The core of this

dispute involves Plaintiff's private medical history and the University's failure to accommodate a

3

disability under the Americans with Disabilities Act ("ADA"). There is a strong legal claim under Section 504 of the Rehabilitation Act.

**2. Grounds for Pseudonymity** Plaintiff suffers from **Major Depressive Disorder (MDD)**, a sensitive and private mental health condition. The Third Circuit, in *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011), establishes that a party may proceed anonymously when "the injury litigated against would occur as a result of the disclosure of the party's identity."

**3. Risk of Stigma and Injury** If required to litigate under his true name, Plaintiff's sensitive psychiatric history and the details of his academic grievance would become a matter of permanent public record. Such a disclosure would result in direct exacerbation of Plaintiff's medical condition due to the stress of public exposure. That disclosure itself would constitute the injury being litigated against. When a litigant sufficiently alleges a reasonable fear of severe harm from litigating without a pseudonym, courts should balance the plaintiff's interest and fear against the public's strong interest in the open litigation process, using the framework from Doe v. Provident Life and Acc. Ins. Co., 176 F.R.D. 464 (E.D. Pa. 1997), which Megless expressly endorsed. The Megless/Provident Life framework includes consideration of whether: (1) the litigant's identity has been kept confidential; (2) the information is of the utmost intimacy; (3) the opposing party is legitimately prejudiced; and (4) the opposition to pseudonymity is illegitimately motivated

## I. Maintenance of Confidentiality

The Plaintiff has treated their MDD diagnosis as a highly guarded, private medical fact. Under *Provident Life*, the court looks for a "consistent history" of maintaining secrecy. Because MDD is a clinical condition protected by the highest expectations of medical privacy (and the constitutional privacy interests recognized under Whalen v. Roe), the Plaintiff's efforts to limit MDD information to a tight circle of medical providers and necessary administrative accommodations demonstrate a clear intent to keep the identity and the condition linked only in confidential settings. The "Disclosure as Injury" Argument: The injury here is the unmasking itself. If the court denies pseudonymity, it effectively destroys the "status quo" of confidentiality that the Plaintiff has meticulously maintained. Because the diagnosis has not been voluntarily "placed in the public square," the forced disclosure via the public docket would be an irreversible harm that cannot be undone by a later judgment.

Plaintiff kept his MDD off social media and public records, and only medical providers, certain administrators at the University, Plaintiff's parents, and lawyers have had access to it.

## II. Information of the Utmost Intimacy

The Third Circuit has consistently held that medical and psychological information sits at the apex of the "utmost intimacy" hierarchy. MDD is not merely an "embarrassing" fact; it is a sensitive psychiatric condition involving personal struggle, clinical treatment, and potential social stigma. The "Disclosure as Injury" Argument: The argument is not that publicizing the name would be "uncomfortable," but that the impact of disclosure is irreversible and disproportionate. Requiring the Plaintiff to attach their legal name to their psychiatric history

5

forces them to choose between their right to seek judicial redress and their right to medical privacy. For a litigant with MDD, the psychological toll of public exposure is not a side effect of litigation—it is a direct injury that exacerbates the very condition being disclosed.

### III. Lack of Legitimate Prejudice to the Opposing Party

In this matter, the Opposing Party (the University/Defendant) is already fully aware of the Plaintiff's true identity. They have the records, they know the individual, and they can conduct discovery, take depositions, and file motions under seal. Therefore, the Defendant's ability to defend the case on the merits remains entirely intact. The "Disclosure as Injury" Argument: Because the Defendant suffers zero tactical disadvantage, their insistence on a public name-match serves no "legitimate" defense purpose. When the harm to the Plaintiff (the irrevocable loss of mental health privacy) is weighed against the zero-sum prejudice to the Defendant, the balance tips decisively toward pseudonymity. The public's abstract interest in a name is insufficient to justify the concrete injury of disclosing a clinical MDD diagnosis.

### IV. Illegitimacy of the Opposition's Motivation

When a Defendant opposes a pseudonym despite having full knowledge of the Plaintiff's identity, the court must scrutinize their motive. If the Defendant already knows the plaintiff's identity and is not harmed in its ability to defend the case, any opposition to anonymity should be given limited weight.  The "Disclosure as Injury" Argument: The opposition is "illegitimately motivated" if it seeks to use the public docket as a weapon of attrition. By forcing the Plaintiff to endure the "injury" of mental health disclosure as a "fee" for entering the courthouse, the Defendant is leveraging the Plaintiff's MDD to create a barrier to justice. Under the Provident

6

Life endorsement in Megless, the court should reject any attempt to use the public's "right to know" as a shield for what is effectively administrative or legal harassment.

**The Countervailing Counter-Factors Disfavoring Anonymity Are Heavily Outweighed**

While *Megless* identifies three factors that generally disfavor pseudonymity, an analysis of those factors demonstrates that the public interest in openness is not compromised here, and Defendants face zero prejudice.

**The Universal Public Interest in Access to Litigant Identities is Satisfied by Open Substantive Proceedings.** The seventh factor looks to the general public interest in knowing a litigant's true identity. *Megless*, 467 F.3d at 298. While Plaintiff acknowledges the strong presumption of openness in judicial proceedings, that presumption is not absolute. Here, the public's interest in the *substantive issues* of this case—namely, institutional policy—will be fully satisfied. The entire docket, including legal arguments, motions, and subsequent judicial opinions, will remain completely open and accessible to the public. The public loses nothing of structural or educational value by withholding only the specific, alphanumeric linkage between Plaintiff's legal name and his private psychiatric history. Because the public can fully monitor the court's performance and the mechanics of the case without knowing Plaintiff's identity, the universal interest in access is functionally preserved.

**Defendant Suffers No Operational or Procedural Prejudice.** The eighth factor assesses whether the defense will be prejudiced if the plaintiff proceeds under a pseudonym. *Id.* In this matter, Defendants face absolutely no prejudice. Plaintiff has not hidden his identity from the parties involved; Defendants know precisely who Plaintiff is and are intimately familiar with the underlying academic grievance and medical accommodation history. Defendants retain the

7

unfettered ability to conduct full discovery, take depositions, file responsive pleadings, and assert all available legal defenses. Because the restriction on Plaintiff's name applies strictly to the public-facing docket and does not impede the Defendants' ability to litigate the merits, this factor does not weigh against pseudonymity.

**There is No Compelling Public Interest in This Specific Identity, and No Atypical Defense Costs Will Inure.** The final factor considers whether there is an unusually high public interest in the specific identity of the litigant (such as cases involving high-profile public officials) or whether anonymity would create atypical defense costs. *Id.* Plaintiff is a private individual and a doctoral student; he holds no public office, commands no public authority, and the resolution of his claims does not hinge on public prominence. Furthermore, allowing Plaintiff to proceed under a pseudonym introduces no administrative or financial burdens on the defense, as it requires no atypical litigation workflows beyond standard redactions.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO PROCEED UNDER A PSEUDONYM**

**I. INTRODUCTION**

Plaintiff has filed this action alleging statutory violations under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, alongside Pennsylvania state law claims for breach of contract arising from his abrupt and procedurally deficient dismissal from Defendant University's doctoral program. Because the prosecution of this case fundamentally requires the introduction of highly sensitive psychiatric evidence regarding Plaintiff's clinical diagnosis of Major Depressive Disorder (MDD)—the public disclosure of

8

which will cause immediate, severe, and irreversible regression of his medical condition—Plaintiff moves to proceed under a pseudonym.

Plaintiff does not seek to hide his identity from the Court or from Defendant. Defendant is fully aware of Plaintiff's true identity, holds all relevant records, and faces zero operational prejudice in defending this action. Because Plaintiff's compelling medical privacy interest heavily outweighs any abstract public interest in his name, the *Megless* balancing test tips decisively in favor of pseudonymity.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 10(a), a complaint must generally include the names of all parties. However, the United States Court of Appeals for the Third Circuit recognizes that a plaintiff may proceed under a pseudonym when exceptional circumstances displace this presumption of openness. *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).

To determine whether a plaintiff may proceed anonymously, the Third Circuit mandates a strict two-step analytical framework:

1. **The Threshold Evaluation:** The plaintiff must first demonstrate "both (1) a fear of severe harm, and (2) that the fear of severe harm is reasonable." *Id.* This two-part showing is a mandatory prerequisite. Only when this threshold is sufficiently satisfied may a court advance to the second step of the analysis. *Id.*

2. **The Nine-Factor Balancing Test:** Once a reasonable fear of severe harm is established, the court must balance the plaintiff's interest in anonymity against the public interest in

open judicial proceedings, utilizing six factors that favor anonymity and three factors that disfavor it. *Id.* at 409.

## III. ARGUMENT

### A. Plaintiff Meets the Mandatory Threshold Prerequisite: He Possesses an Objectively Reasonable Fear of Severe Harm to His Clinical Health That Transcends Mere Embarrassment

Before evaluating the nine structural *Megless* factors, this Court must first determine whether Plaintiff has established a reasonable fear of severe harm. *Megless*, 654 F.3d at 408. Plaintiff easily clears this threshold prerequisite.

The law is clear that "embarrassment alone" or "the possible revelation of a general medical decision" is insufficient to overcome the presumption of public access. *Id.* If general medical privacy sufficed, any standard litigant undergoing a routine medical procedure could claim anonymity, effectively swallowing Rule 10(a). Plaintiff's application does not rely on generic discomfort, a desire to avoid professional awkwardness, or routine medical privacy. Rather, Plaintiff's fear is pinned directly to an **imminent, documented threat of severe clinical psychiatric regression.**

As a matter of objective evidence, Plaintiff has been formally diagnosed by his treating physician with **Major Depressive Disorder (MDD) with somatic symptoms** (see doc 67). Far from a routine or static medical condition, Plaintiff's psychiatric data demonstrates a severe, active, and acute clinical vulnerability. As explicitly documented in the certified medical records

10

of NYU Langone Health, Plaintiff's clinical state has already undergone a dramatic and profound regression directly triggered by the acute trauma of his academic termination.

The severe nature of Plaintiff's psychiatric condition is marked by extreme, debilitating clinical manifestations, including:

- Objective somatic pathology, including debilitating upper back muscle pain and full-body tightness that directly impairs cognitive concentration (see doc 67);

- Profound, dangerous sleep disruptions, causing Plaintiff to remain awake for 34 consecutive hours followed by a mere 2 hours of sleep, and separate periods of lying in bed immobilized for 12 hours at a time (see doc 67);

- A sharp drop in baseline executive self-care, resulting in a marked reduction in appetite and an inability to exercise (see doc 67); and

- The clinical necessity for immediate, daily intervention via a prescribed psychotropic antidepressant medication (**duloxetine 30 mg**) (see doc 67 and see doc 68)

This evidentiary record transforms Plaintiff's request from an issue of mere "privacy" to an issue of **strict medical necessity**. For a patient suffering from an acutely destabilized presentation of MDD with somatic symptoms, the forced public attachment of his legal name to these intimate, raw records of psychiatric distress on a permanent electronic docket (ECF) does not merely cause distress—it operates as an independent, immediate clinical trigger.

The harm feared here is the catastrophic, permanent exacerbation of a protected mental disability before the merits of the case can be adjudicated. Because Plaintiff has provided concrete physician attestation documenting that his clinical condition is directly tied to the underlying administrative trauma, his fear that public unmasking will induce a severe

psychological breakdown is objectively reasonable, legally substantial, and entirely distinct from garden-variety medical privacy concerns.

Because the mandatory threshold gatekeeper is satisfied, a plenary evaluation of the nine *Megless* balancing factors is legally warranted.

## How Plaintiff's Case Transcends "Routine Privacy"

Plaintiff's specific situation, supported by Plaintiff's NYU Langone medical record, moves directly out of the realm of "routine privacy" and into the territory of "severe harm" because of four distinct, documented clinical factors:

| Feature | Routine Medical Privacy Concerns | Plaintiff's Documented Case (Severe Harm Threshold) |
|---|---|---|
| **Clinical Severity** | General stress, mild anxiety, or standard "uncomfortableness." | Formal diagnosis of **Major Depressive Disorder (MDD) with somatic symptoms (See doc 67)**. |
| **Physical Pathology** | No physical manifestation of the psychological stress. | Severe, involuntary **upper back muscle pain and full-body tightness** that directly impairs cognitive concentration **(See doc 67)**. |
| **Basic Functioning** | Disrupted sleep patterns or temporary feelings of being upset. | Dangerous, acute sleep deprivation—**staying awake for 34 consecutive hours followed by only 2 hours of sleep**, or remaining immobilized in bed for 12 hours at a time **(See doc 67)**. |

| Medical Intervention | Standard therapy, lifestyle adjustments, or no active medication. | Sudden clinical necessity for daily psychotropic antidepressant intervention via prescribed **duloxetine 30 mg (See doc 67 and doc 68)**. |
|---|---|---|

**B. The Six Factors Favoring Anonymity Weigh Heavily in Plaintiff's Favor**

**Factor 1: The extent to which the identity of the litigant has been kept confidential.**

The first factor requires the court to assess whether the litigant has historically maintained the secrecy of the sensitive information. *Doe v. Megless*, 654 F.3d 404, 409 (3d Cir. 2011). As documented in the accompanying medical records from NYU Langone Health, Plaintiff has treated his clinical diagnosis of Major Depressive Disorder (MDD) with somatic symptoms as a highly guarded, private medical fact. He has established a rigorous history of confidentiality:

- **Public & Social Media Records:** Plaintiff has never disclosed, discussed, or referenced his MDD diagnosis, psychiatric treatments, or academic grievances on any social media platforms, public internet forums, or public records.

- **Restricted Circle of Knowledge:** Knowledge of Plaintiff's psychiatric condition has been strictly limited to his treating medical providers, certain administrators at the University, his parents, and lawyers.

- **Institutional Context:** Within the University, the diagnosis was maintained confidentially and disclosed strictly on a need-to-know basis to relevant administrators—including via formal appeal submissions to the Vice Dean—solely to

secure "Reasonable Accommodation" under the ADA, mitigate the impact of the medical condition, and preserve rights under applicable disability frameworks.

Because Plaintiff has meticulously insulated his identity from public linkage with this clinical condition, a denial of pseudonymity would permanently destroy the status quo of confidentiality that he has actively maintained.

**Factor 2: The bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases.**

The second factor evaluates the nature and weight of the harm the plaintiff fears upon disclosure. *Id.* Plaintiff's fear of disclosure is grounded in the preservation of his core right to medical privacy and the prevention of permanent professional destruction. MDD is a severe clinical psychiatric condition involving deep personal struggle, intensive clinical treatment, and a high risk of profound social and professional stigma.

Forcing a doctoral student to affix his true name to a permanent public docket containing detailed psychiatric assessments and clinical evidence forces an unconscionable choice between seeking judicial redress for discrimination and forfeiting his core right to medical privacy. This fear is substantial, concrete, and directly tied to the protection of intimate medical data. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977).

**Factor 3: The magnitude of the public interest in maintaining the confidentiality of the litigant's identity.**

Under the third factor, the court examines whether there is a public interest served by keeping the litigant anonymous. *Megless*, 654 F.3d at 409. The public interest is strongly served by allowing individuals with severe mental health disabilities to enforce federal

14

anti-discrimination statutes (like the ADA) without fearing a permanent, public "outing" of their psychiatric diagnoses.

As documented by Dr. Sally H. Kwa, Plaintiff's MDD has already severely regressed due to the acute stress and sadness caused by his father's cancer and his abrupt termination from school (see doc 67). The public has a compelling interest in ensuring that the federal courts remain open to vulnerable litigants. If the court denies pseudonymity, it signals to future disabled students that the "cost" of entering the courthouse is the irreversible public exposure of their intimate medical files, which creates a chilling effect on enforcement of the ADA.

**Factor 4: Whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities.**

The fourth factor looks to whether the resolution of the case hinges on the specific identity of the individual or broader questions of law. *Id.* Here, the public interest in this case is functional, focusing on whether a major, federally funded university adheres to due process and federal anti-discrimination mandates within its doctoral programs.

This interest is fully satisfied by the open, public nature of the substantive proceedings. The entire docket—including all statutory interpretations, procedural timelines, legal arguments, motions, and subsequent judicial opinions—will remain completely transparent and accessible to the public. Because the public can fully monitor the court's performance and the mechanics of the case without knowing Plaintiff's specific identity, the universal interest in access is functionally preserved, and the public interest in knowing Plaintiff's alphanumeric legal name is atypically weak.

15

**Factor 5: The undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified.**

The fifth factor evaluates whether forcing the disclosure of the plaintiff's name would effectively compel them to abandon their meritorious suit rather than face the trauma of unmasking. *Id.* For a litigant with MDD, the psychological toll of public exposure is not an incidental byproduct of litigation—it is an independent, irreversible injury.

Plaintiff's clinical records document severe somatic symptoms, including profound insomnia where he lay in bed for 12 hours unable to sleep. Subjecting a client in a fragile psychiatric state to the acute stress of public exposure threatens severe clinical regression. Forcing Plaintiff to choose between his health and his right to seek judicial redress creates an unacceptable barrier to justice, making an adverse outcome (such as a forced dismissal or abandonment of claims) highly undesirable and entirely attributable to the price of public identification.

**Factor 6: Whether the party seeking to sue pseudonymously has illegitimate ulterior motives.**

The final factor favoring anonymity is a clear negative-check to ensure the plaintiff is acting in good faith. *Id.* Plaintiff has absolutely no illegitimate ulterior motives. He is not a criminal defendant or a rogue actor attempting to escape public accountability or shield a blameworthy reputation. He is a private doctoral student seeking civil redress for an unlawful academic dismissal. He has no desire to hide his identity from the court or from the defense; he seeks a pseudonym strictly as a shield to protect his private health status.

**C. The Three Countervailing Factors Disfavoring Anonymity Are Absent**

**1. Factor 7: The universal public interest in access to the identities of the litigants.**

The seventh factor represents the general presumption of openness in judicial proceedings. *Id.* While Plaintiff acknowledges this foundational principle, the public's interest in this specific case is functional, not voyeuristic. The public oversight of this case is fully vindicated by keeping the substantive proceedings completely transparent. The public loses nothing of educational, oversight, or structural value by withholding only the specific alphanumeric linkage between Plaintiff's legal name and his private medical history.

**2. Factor 8: Whether the defense will be prejudiced.**

The eighth factor examines whether the defense will suffer tactical or operational prejudice if the plaintiff proceeds under a pseudonym. *Id.* In this matter, Defendant faces absolutely zero operational prejudice. Plaintiff has not hidden his identity from the parties involved in the lawsuit; Defendant knows precisely who Plaintiff is, possesses his full academic file, and is intimately familiar with his medical accommodation history. Defendant retains the unrestricted ability to conduct full discovery, execute depositions, file responsive pleadings, and assert all substantive legal defenses.

**3. Factor 9: Whether there is an atypically high public interest in the specific identity, or atypical defense costs.**

The final factor considers whether the litigant is a high-profile public official whose identity carries unique public consequence, or if the pseudonymity creates atypical defense costs.

17

*Id.* Plaintiff is a private individual and a doctoral student; he holds no public office, commands no public authority, and the resolution of his claims does not hinge on public prominence. Furthermore, allowing Plaintiff to proceed as "John Doe" introduces no atypical litigation workflows or financial burdens on the defense beyond standard administrative redactions.

## IV. OVERALL FAIRNESS ANALYSIS & DEFENDANT'S MOTIVATION

Beyond the formal *Megless* factors, an overall analysis of procedural equity heavily supports pseudonymity. Because Defendant is already fully aware of Plaintiff's identity and suffers zero tactical disadvantage in its ability to defend this case on the merits, **Defendant's opposition to anonymity should be given limited weight by this Court.**

When a defendant possesses full knowledge of a plaintiff's identity yet insists on a public name-match, such opposition lacks a legitimate defensive purpose. Under these circumstances, forcing the Plaintiff to endure the severe clinical "injury" of a public mental health disclosure operates effectively as an unconscionable "entry fee" for access to the federal courthouse. This Court should reject any attempt to leverage the public docket as a weapon of attrition to force the abandonment of a meritorious ADA claim.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's compelling interest in maintaining the privacy of his sensitive psychiatric history heavily outweighs the negligible public interest in his specific name. Plaintiff respectfully requests that this Court grant his Motion to Proceed Under a Pseudonym and direct the Clerk to enter Plaintiff's name as "John Doe" on the public docket.

**4. Lack of Prejudice to Defendants** Plaintiff is not seeking to hide his identity from the Court or the Defendants. Plaintiff will provide his true identity to Defendants' counsel for the purposes of discovery and litigation. Thus, there is no prejudice to the University in allowing the public-facing record to remain under a pseudonym.

**5. The Public Interest** The public interest in this case—ensuring that universities follow due process and the ADA—does not require the disclosure of Plaintiff's specific identity. Rather, the public interest is served by allowing individuals with mental health disabilities to seek judicial relief without the fear of permanent public "outing" of their condition.

6. While Penn is not a government body in the constitutional sense, **Penn receives substantial federal funding**, and the public interest in monitoring federally funded institutions is somewhat different from suits against purely private parties.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant him leave to proceed under the pseudonym **"John Doe"** and that all future filings in this matter be captioned accordingly.

Plaintiff, John Doe, moves this Court pursuant to Fed. R. Civ. P. 65 and Local Civil Rule 65.1 for a Temporary Restraining Order ("TRO") and Preliminary Injunction.

1. Plaintiff is a doctoral student at the University of Pennsylvania Graduate School of Education ("GSE").

2. Defendants have issued a dismissal notice that effectively terminates Plaintiff's enrollment and research residency.

3. Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures. The institution made a specific promise (e.g., a specific appeal process) and failed to perform. Defendants are also in violation of the Americans with Disabilities Act ("ADA"). There is a strong legal claim under Section 504 of the Rehabilitation Act.

4. Immediate and irreparable harm will result to Plaintiff's career, research, and health if he is removed from the program before this matter can be heard on the merits.

5. As set forth in the accompanying Memorandum of Law, Plaintiff has a high likelihood of success, the balance of equities favors Plaintiff, and the public interest is served by upholding due process.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter the attached Proposed Order granting the TRO and Preliminary Injunction.

---

## 2. Brief / Memorandum of Law

This argues for the **Four-Factor Standard**.

### I. Likelihood of Success on the Merits

1) **The university violated under Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act ("ADA").**

20

**Background:**

Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "After receiving Ms. Lauren Rudick's email stating that her office "provides support, advocacy, and intervention on behalf of students" on February 10, my son attended the meeting with Ms. Lauren Rudick [Director of Student Intervention Services] and her colleague [an unidentified colleague of Lauren Rudick, who attended a meeting on February 16, 2026 at approximately 4:00 PM]."

A failure-to-accommodate claim requires: (1) the plaintiff is disabled, (2) the defendant had notice, (3) the accommodation requested was reasonable, and (4) the defendant failed to accommodate. The brief will address these four in the following:

**(1) the plaintiff is disabled.** Plaintiff contacted Disability Services at the Weingarten Center at Upenn, the approximate date of first contact was in January 2025. Plaintiff has been approved for accommodations from Disability Services at the Weingarten Center at Upenn due to his disability besides MDD since January 2025; the accommodations were granted from Disability Services at the Weingarten Center at Upenn based on a completely separate, distinct disability; it has been **apart from** Plaintiff's MDD (See doc 59 and doc 60).

Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "Prior the meeting date, Ms. Rudick never mentioned in the email that her colleague will also participate and interrogate my son."

21

**(2) the defendant had notice.** Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "The university was already aware of my son's mental health concerns. On December 23, 2025, my son sent an email to a Penn GSE professor [Seiji Isotani] who is involved in my son's matter, and my son wrote, "I am very emotionally stressed out and feeling unwell." (See doc 57) Also, on December 29, 2025, my son had a scheduled Zoom meeting with Dr. Rand Quinn, who is the chair of Policy, Organizations, Leadership and Systems, but my son cancelled that zoom meeting because my son wrote, "Because I am not feeling well, I am unable to attend the meeting on December 29 at 10 am." (see doc 56 )

Plaintiff's father also wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "Also, on January 29, 2026, my son had a scheduled Zoom meeting with Mr. Chris Kubik Cedeño, who is Director of Academic Affairs at Penn GSE but my son cancelled that zoom meeting because my son wrote on January 28, 2026, "I need cancel our optional informational Zoom meeting scheduled for tomorrow at 12:00 PM as I am not feeling well" (see doc 64).

**(3) the accommodation requested was reasonable, and (4) the defendant failed to accommodate.** Plaintiff's father also wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "On February 10, 2026, Ms. Rudick wrote before my son's zoom meeting request, "I'm reaching out because I heard that you are dealing with a very stressful academic situation." (see doc 58) Prior to the in-person meeting, my son requested that the meeting be conducted via Zoom due to his condition, but that request was denied. My son requested the zoom meeting by email on February 11, 2026 to Ms. Rudick, but she wrote on February 12, "I'd like to meet you in person." (see doc 58) The university failed to provide

22

reasonable accommodations for my son for that meeting. Therefore, my son was discriminated on a disability type basis. The university has violated under Section 504 of the Rehabilitation Act and/or the ADA."

Plaintiff's father also wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, "While the formal clinical diagnosis of Major Depressive Disorder was finalized shortly after the February 16 meeting, the University had been under actual notice of the symptoms of this disability for months. Between December 2025 and February 2026, the student disclosed a consistent pattern of being 'unwell' and 'emotionally stressed' to multiple officials, including Dr. Quinn, Mr. Kubik Cedeño, and another Penn GSE professor who is involved in my son's matter. When my son requested Zoom on February 11, my son was seeking a reasonable modification for the very symptoms the University had already acknowledged. By ignoring this request and providing no alternative other than an in-person meeting,  the University failed in its duty to accommodate a student they regarded as impaired, a failure that was later confirmed by the formal Major Depressive Disorder diagnosis. Having had my son's request for a Zoom accommodation ignored by an administrator who explicitly acknowledged his 'very stressful' state, my son felt he had no alternative but to attend in person to protect his academic standing. While this letter focuses on the specific failures of the February 16 meeting, my son reserves the right to present all evidence regarding his status as a qualified individual with a recognized disability and the University's prior knowledge of his need for accommodations. During the meeting, he expressed that he was under stress, and he requested to end the meeting early. Despite this, questioning continued. After the meeting, my son did not sleep for about 34 hours. On February 18, 2026, my son was diagnosed with Major Depressive Disorder with somatic symptoms and stress-related muscle pain directly linked to the

University's recent actions. He has been prescribed daily medication (Duloxetine) and muscle relaxants."

**Establish the Baseline:** Plaintiff was a qualified individual with a disability under the ADA at all relevant times due to a documented learning disability/Neurodevelopmental Disorder formally registered with the Weingarten Center.

**Re-contextualize the Communications:** Plaintiff's December 2025 and January 2026 communications regarding being "unwell" must be viewed through the lens of this existing, known disability—putting the university on notice that its accommodated student was experiencing an escalation of academic barriers.

**Plead in the Alternative (The MDD Timeline):** To the extent that the university claims ignorance of the emerging MDD diagnosis prior to February 18, the university explicitly *regarded* the Plaintiff as substantially impaired during the February 11 interactive dialogue, yet failed to maintain the protections guaranteed under the ADA.

2. **The university committed due process violations**

**Unfair termination process from the beginning and violation of Supreme Court precedent (**Goss v. Lopez, 419 U.S. 565 (1975), Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), and Mathews v. Eldridge).

In Plaintiff's appeal letter to "Exceptions to Academic Policies," Plaintiff wrote, "I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "This termination letter was written by Chair Rand Quinn. Right after about 3 minutes the meeting ended by Zoom on December 18, Katharine forwarded Chair Quinn's letter to my son's email. (see doc 53, 54, 55) Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's

24

discussion. Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story." Also, I was doing homework assigned by my academic advisor, Professor Jonathan A. Supovitz, for finding an AI expert during the Fall semester so my academic advisor, Professor Jonathan A. Supovitz did not get a chance to hear my side of the story." Education Chair Quinn wrote an email on December 10, before my meeting with Katharine, "I am unavailable to meet next week, so Dean Strunk will meet with you instead. She will be joined by Leslie Levin, Vice Dean of Admissions and Student Affairs." (See doc 52) During that meeting on December 18, Professor Susan Yoon was there as a witness. Ms. Leslie Levin was not there on December 18. Therefore, "Chair Quinn wrote the termination letter without hearing [my] side of the story," which is a violation of Goss v. Lopez, Board of Curators of the University of Missouri v. Horowitz, and Mathews v. Eldridge. In Goss v. Lopez, the Supreme Court ruled "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  In Board of Curators of the University of Missouri v. Horowitz, due process rights of students in academic dismissal proceedings matters. Furthermore, Mathews v. Eldridge establishes due process rights in academic dismissal proceedings.

In addition, Plaintiff wants to cite his father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding his matter. Plaintiff's father wrote to Vice Provost Jordan-Sciutto, "According to my son's recollection, before my son had a chance to say his side of the story to Katharine, Katharine said nothing will change her mind and keep interrupting my son, so my son told her to give him about 5 minutes of uninterrupted time so my son can tell his side of the story."

25

In Plaintiff's rebuttal letter submitted to Ms. Leslie Levin on March 31, 2026, Plaintiff wrote, "this is very important. In Professor Quinn's termination letter on December 18, 2025, it stated, "At that time [in May], they voted on whether you should be permitted to continue in the program, and the vote was in favor of dismissal." (See doc 55) This information was not given to me during that time back in May 2025. I found this out for the first time on December 18, 2025 when I received the official termination letter from Dean Strunk (see doc 55). I wish top administrators could have told me this back in May 2025 instead of the written official termination letter on December 18, 2025 for the first time because I would have 2 research advisors instead of 1 research advisor for the fall semester 2025." Education Chair Rand Quinn, Associate Dean Susan A. Yoon, Education Dean Katharine O. Strunk, academic advisor Jonathan A. Supovitz, former academic advisor and former research advisor Ericka S. Weathers, Michael A. Gottfried (education chair during Plaintiff's 1st year in the Ph.D. program and Education Policy program chair during Plaintiff's 1st year and 2nd year in the Ph.D. program), and Vice Dean Leslie M. Levin who knew "the [Plainiff's Ph.D.] program has elected not to advance [John Doe]...the program is recommending dismissal from the PhD program [in May 2025]" but they did not tell Plaintiff from May 2025 to prior December 18, 2025 termination meeting. See doc 62. This doc 62 was given by Vice Dean Leslie M. Levin during Plaintiff's Penn GSE appeal process under "exception track" on March 20, 2026.

When the decision-maker (Education Chair Rand Quinn) wrote the termination letter *before* hearing Plaintiff's side, the decision-making process was a sham. It wasn't based on an "individualized assessment" of Plaintiff's progress; it was an arbitrary conclusion reached in a vacuum. If a Ph.D. program at Upenn that is supervised by the Provost office allows other

26

students to respond to "dismissal votes" or provides them with notice of academic concerns before a final vote, but denied Plaintiff that same process, they have applied their policies inconsistently. Under Goss v. Lopez, Board of Curators of the University of Missouri v. Horowitz, and Mathews v. Eldridge, the university is prohibited from reducing Plaintiff to a "file" to be dismissed without the same individualized fairness they afford to others.

On March 10, 2026, Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE, "We request an extension to April 15, 2026, for any response deadlines due to [my son]'s recent diagnosis with Major Depressive Disorder on February 18, 2026. Medical documentation is attached."

However, Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE wrote on March 12,  "Unfortunately, we cannot accommodate your request for an extension to submit your petition to the Committee on Degrees.  Our Committee has had their meeting date scheduled for quite some time, and this meeting will occur at the end of this month.  Thus, we will need to adhere to the March 15, 2026 (by 11:59 pm) deadline as has been communicated to you." (see doc 50)

Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 30, 2026, "My son will formally respond to "the documents submitted to the Committee on Degrees on behalf of GSE" by Tuesday, March 31. Meanwhile, my son requests "the documents submitted to the Committee on Degrees on behalf of GSE" to include only about 6 weeks of assessments (from around August 28, 2025 to October 29, 2025 ) from Professor Isotani because Right after about 3 minutes the meeting ended by Zoom on December 18, 2025 with Dean Katharine Strunk,  Dean Katharine Strunk forwarded Chair Quinn's email to

27

my son's email; in that letter dated on December 18, 2025, Dr. Quinn included about only 6 weeks of my son's research apprenticeship performance with Professor Isotani (from around August 28, 2025 to October 29, 2025 ); according to Dr. Quinn's letter (December 18, 2025), that was one of his factors for Dr. Quinn's decision. (Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's discussion. Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story. My son will provide email evidence that Chair Quinn and Professor Supovitz were not there on December 18, 2025.) However, "the documents submitted to the Committee on Degrees on behalf of GSE" that you sent my son on March 20, 2026 includes about 14 weeks of my son's research apprenticeship performance with Professor Isotani; the Committee is looking at evidence that did not exist when the original decision was made by Chair Quinn=The evidence exceeds the scope of the underlying decision (Dr. Quinn's letter dated on December 18, 2025);  "The documents submitted to the Committee on Degrees on behalf of GSE" that you sent my son on March 20, 2026 deviates from the original termination letter's time framework (the original termination letter written by Dr. Quinn's letter dated on December 18, 2025) of about only 6 weeks of my son's research apprenticeship performance with Professor Isotani (from around August 28, 2025 to October 29, 2025)."

    Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 30, 2026, "By requesting that the Committee limit its review to the initial about six-week period, my son does not concede the accuracy of those assessments; rather, he is insisting that the Committee adhere to the proper scope of the administrative record. Professor Isotani's remaining about 6 weeks of the fall semester of 2025 evaluation of my son's research

28

apprenticeship performance  (from after October 29, 2025 to December) was tainted by the Chair Quinn's termination letter dated December 18, 2025, making those evaluations legally unreliable. My son requests  "the documents submitted to the Committee on Degrees on behalf of GSE" to include only about 6 weeks of assessments from Professor Isotani from around August 28, 2025 to October 29, 2025 because that's what Dr. Quinn's original termination letter (December 18, 2025) covers. In Goss v. Lopez, the Supreme Court held that due process requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Here, my son was only on notice of approximately 6 weeks' worth of assessments (Professor Isotani) as forming the basis for the termination. Expanding the evidentiary record to 14 weeks at the appeal stage, without that having been the stated basis for the original decision, raises a fair notice concern."

Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE wrote an email to Plaintiff on March 26, 2026, "If you would like to submit a response to the documents [rebuttal response that Plaintiff can submit to Penn GSE] that were sent to the Committee on Degrees from GSE, please do so no later than 11:59 pm on Tuesday, March 31ˢᵗ ." (see doc 49). Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE gave approximately 7 business days for Plaintiff to write the rebuttal response despite Plaintiff having MDD and the Plaintiff had 5 courses (being full time Ph.D. students), and Penn GSE having access to these information about Plaintiff. In Plaintiff's Ph.D. program in his education policy division, only 4 courses for full time Ph.D. students in education policy division are allowed unless a special permission is granted.

Plaintiff's father wrote that the university was committing due process violations and communicated that by email on March 30, 2026, but Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE wrote an email to Plaintiff's father after the rebuttal response deadline passed and said Penn GSE will consider 14 weeks, which put Plaintiff at enormous disadvantage in his appeal process;  Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE wrote on April 1, "Dear [John Doe], I am writing to confirm receipt of your father's email from Monday, March 30th.  Please note that the totality of your academic performance [14 weeks under Professor Isotani's research] is relevant and appropriate to share with the Committee on Degrees." (see doc 48)

Furthermore, in the plaintiff's appeal letter to Penn GSE, Plaintiff stated, "I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "When the termination letter written by Chair Rand Quinn, he also cites Prof. Isotani's email on October 29, 2025 as a reason to terminate my son from the Ph.D. program. However, based on my son's recollection, Prof. Isotani's email reflects [mostly] about "one day of research [meeting]" with my son; this is insufficient evidence to use to terminate my son from the Ph.D. program. Also, that October 29 email from Prof. Isotani contains material inaccuracies and do not fairly reflect my son's research contributions. Based on my son's recollection, my son has about one year research contract from this fall semester to June 2026 with Upenn, so to use my son's [mostly] about "one day of research [meeting]" with  Prof. Isotani is insufficient." In December 2025, January 2026, February 2026, and before March 20, 2026, regarding Professor Isotani's evaluation toward Plaintiff, Plaintiff had the evaluation of only [mostly] about "one day of research [meeting]" from Professor Isotani.

Suddenly, on March 20, 2026, Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE gave Plaintiff "the documents submitted to the Committee on Degrees on behalf of GSE" which included approximately 14 weeks of research work with Professor Isotani, and Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE gave approximately 7 business days for Plaintiff to write the rebuttal response despite Plaintiff having MDD and the Plaintiff had 5 courses (being full time Ph.D. students) as mentioned above; this action by Penn GSE is due process violations and  violation of Supreme Court precedent (Goss v. Lopez, 419 U.S. 565 (1975), Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), and Mathews v. Eldridge).

**3) The Facts map two well-established theories for challenging academic dismissals: Due Process (14th Amendment / § 1983)**

The research apprenticeship with Professor Seiji Isotani lasted about one semester (Fall semester of 2025), which is approximately 14 weeks, yet Associate Dean Susan A. Yoon, Education Chair Rand Quinn, Dean Katharine O. Strunk, and academic advisor Jonathan A. Supovitz evaluated the Plaintiff as having performed poorly based on only approximately the first six weeks of the semester of research work.

The October 29, 2025 email that Professor Seiji Isotani wrote, which was received by Education Chair Rand Quinn. Associate Dean Susan A. Yoon, Chair Rand Quinn, and Dean Katharine O. Strunk cannot reasonably be used to conclude that the student performed poorly, because it was based on an evaluation from mostly a single day meeting with Professor Seiji Isotani. Most of the research work with Professor Seiji Isotani consisted of library-research related tasks during the first six weeks of the semester of research work.

31

In order to prepare the agreement letter for dismissing the student on December 18, 2025, Associate Dean Susan A. Yoon, Education Chair Rand Quinn, Dean Katharine O. Strunk, and academic advisor Jonathan A. Supovitz secretly rushed to prepare the document based only on about 6 weeks of research, without informing the Plaintiff beforehand.

The Plaintiff recalled that the Plaintiff saw Associate Dean Susan A. Yoon for the first time on December 18, 2025 via Zoom along with Dean Katharine Strunk but the Plaintiff did not discuss anything with Associate Dean Susan A. Yoon on December 18 because Dean Katharine Strunk was the only one who spoke to the Plaintiff on December 18 (see doc 65).

On March 30, 2026, Chair Quinn wrote, "My direct interactions with [John Doe] were limited. Beyond my role in helping to establish his advising structure, I was not closely involved in his day-to-day academic progress or coursework" (see doc 63).

Education Chair Quinn wrote an email on December 10, 2025, before my meeting with Dean Katharine Strunk, "I am unavailable to meet next week, so Dean Strunk will meet with you instead. She will be joined by Leslie Levin, Vice Dean of Admissions and Student Affairs." (See doc 52). Education Chair Quinn did not let the Plaintiff know before the meeting that the meeting will be a termination meeting, but Education Chair Quinn wrote the termination letter before the meeting on December 18, 2025, where Education Chair Quinn did not come to the termination meeting.

During that meeting on December 18, Professor Susan Yoon was there as a witness. Ms. Leslie Levin was not there on December 18. Therefore, "Chair Quinn wrote the termination letter without hearing [my] side of the story"; this quotation comes from Plaintiff's father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026.

Professor Seiji Isotani at Penn GSE was newly appointed professor from Brazil in August 2025, so it was not enough time for the student and the professor to adjust with each other about 4 research meetings for research apprenticeship during the 6 weeks period. In addition, Professor Seiji Isotani's teaching assistant was also involved in research in the middle of the process, which created confusion. Professor Seiji Isotani was not available to meet the student every week for research apprenticeship during the first six week period. Frequently, there were no clear instructions from Professor Seiji Isotani, and the research topic and research tasks changed frequently from Professor Seiji Isotani.

The Facts map two well-established theories for challenging academic dismissals: Due Process (14th Amendment / § 1983). The Supreme Court addressed this directly in Board of Curators v. Horowitz, 435 U.S. 78 (1978). The Court held that a student must be "accorded an opportunity to appear personally to contest" allegations of academic deficiency, requiring at minimum an "informal give-and-take" between the student and the administrative body dismissing them, to give the student "the opportunity to characterize his conduct and put it in what he deems the proper context."

**4) Wrongful termination**

In the Plaintiff's appeal letter document to the university back in March 2026, Point 2, 12, 13, 15, 18, 19 are considered as evidence of wrongful termination. Attached these points (2, 12, 13, 15, 18, 19) below:

33

**Point 2**

On June 30, 2025, Professor Weathers pointed out "There were also ongoing challenges related to timely completion of timesheets and preparation for meetings, including difficulties in taking and retaining clear notes to support task completion." I respectfully disagree with those statements. Starting February 12, 2025, Professor Weathers asked for a timesheet on excel spreadsheet (see doc 6). Professor Weathers did not provide me all the necessary information regarding a timesheet on Excel spreadsheet from the beginning via email back on February 12, 2025.Thus, she can't hold me accountable for things on timesheet when she failed to disclose all the necessary information to me from the beginning via email back on February 12, 2025. In that February 12, 2025 email, Professor Weathers attached the sample timesheet, which the format had 4 columns: "date, task description, number of hours, and note (if applicable)" (see doc 6 and doc 9); thus, I sent the timesheet on February 24, 2025 following the exact format such as "date, task description, number of hours, and note (if applicable)" as her attachment showed on February 12, 2025. I did what Professor Weathers asked on a timesheet on excel spreadsheet on February 24, 2025 based on the best available information that she provided at that time on February 12, 2025. Based on reviewing many emails that I interacted with Professor Weathers, after I sent the timesheet on excel spreadsheet on February 24, 2025 to Professor Weathers, I did not hear back from her after approximately 20 days whether I did the timesheet on excel correctly or not.

On March 19, 2025's email, she mentioned that on March 17, 2025's Zoom meeting, she explained about how to revise the timesheet, but during the Zoom meeting on March 17, 2025, I told Professor Weathers that my laptop crashed, and I am using Van Pelt library's laptop that I

34

borrowed from the library, where the audio of the library's laptop was difficult to hear Professor Weathers' voice. I have the receipt that I borrowed the library's laptop because my laptop crashed on that day of the Zoom meeting with Professor Weathers (see doc 12).

Most importantly, when comparing the information that she gave on February 12, 2025's email (see doc 6 and doc 9) VS the information that she gave on March 19, 2025's email (doc 13), there was new information on March 19, 2025 regarding timesheet on excel (i.e. specific style of wording under "task description" category where she gave new information of how she wanted "task description" category to be described such as "searched for literature", "read literature", and "located and found literature" as her images on her email attachment showed; based on her March 19, 2025 email, she wanted "task description" category to be described into a broad general description instead of going into specific details. When I sent the timesheet on excel spreadsheet on February 24, 2025, I did it based on the best available information that she provided at that time on her February 12, 2025 email, where she did not provide information of how she wanted "task description" category to be described such as "searched for literature", "read literature", and "located and found literature", which were described into a broad general description instead of going into specific details; I did "task description" category by going into specific details when I sent the timesheet on excel spreadsheet on February 24, 2025, because I did it based on the best available information that she provided at that time on her February 12, 2025 email.

Also, in her February 12, 2025 email regarding the timesheet on excel, she did not verbally mention that she wants "each tab for the week" regarding timesheets on excel. Based on reviewing many emails that I interacted with Professor Weathers, in a March 19, 2025 email, Professor Weathers for the first time wrote it out verbally that she wants, "each tab for the week"

35

regarding timesheets on excel. After receiving new information from her March 19, 2025 email, approximately within 5 business days, I sent her my updated timesheet on excel by incorporating her recommendations; on March 26, 2025, I wrote to her, "Dear Professor: I attached the timesheet. I incorporated your recommendations" (see doc 10). Bottom line: After Professor Weathers gave me all information on March 19, 2025, I did what she asked on March 26, 2025 (doc 9 and doc 11). As a result, Professor Weathers wrote on March 31, 2025, "Hi [John Doe], Thanks for revisiting the timesheet. This format looks good. Please keep this up" (see doc 11)

**Point 12**

On June 30, 2025, Professor Weathers pointed out, "When I provided guidance on preparing a brief description of a potential research interest—specifically, a single paragraph outlining a possible topic and its significance—you interpreted this as a request for a dissertation proposal. This misinterpretation, despite clarification, reflects difficulty in accurately understanding and acting on advising guidance." I don't think she is telling the whole story. Professor Weathers' email on March 25, 2025 stated, "For instance, we discussed preparing a one-sentence research question and a short paragraph explaining its importance so that you could begin connecting with other faculty (you expressed interest in meeting with others) and developing a summer research project of your own. However, that task wasn't completed, and you shared that you intended to approach it differently by meeting with professors first."

On March 25, 2025, I wrote my response to Professor Weathers, "Dear Dr. Weathers: Regarding the Ph.D. dissertation proposal ("one-sentence research question and a short paragraph"), would you give an extension?  Because  as a first year Ph.D. student, I feel that it is too early to write a Ph.D. dissertation proposal. Here are the reasons. On February 28, I mentioned that I have specific research interests: AI in K-12 education, STEM, and how race

36

(maybe) as a variable can play a role in the context of AI in K-12 education and STEM. I have nothing more to add at this moment than what I mentioned on February 28 during your office. In order to write a Ph.D. dissertation proposal, I was told that you need to find a gap in a particular field (in my case, AI in K-12 education and STEM) and what contribution I will make as an academic scholar at the Ph.D. level in this specific field. As a first-year Ph.D. student, I did not take enough education courses at GSE because I have been focused on fulfilling quantitative requirements in the edu policy division. Last semester, I took only 3 courses, and this semester, I am taking only one education course with Dr. Ryan Baker, and the rest of my coursework this semester is all quantitative courses in order to fulfill quantitative requirements in the edu policy division in the Ph.D. program. During my first year in the Ph.D. program, none of the education courses at GSE have so far connected the link between AI in K-12 education and STEM and how race as a variable can play a role in this context. I believe that by next year, I am schedule to take more education courses at GSE that will hopefully connect these dots. Finally, as a first year Ph.D. student, I did not attend the education conference in Washington D.C. this year because I had a midterm to study. By next Spring 2026, taking more education courses at GSE, attending this education conference in Washington D.C., and speaking with more professors who are experts in STEM and AI in K-12  education can help me to develop a Ph.D. dissertation proposal."

Whether she wants to call it "dissertation proposal" or "summer research project" or "research question," my key takeaways from this email on March 25, 2025 is that she wanted more than just my research areas, and Professor Weathers as my academic advisor should have given more more advanced notice since she knew which courses I was taking the spring semester of 2025.  I emailed her my 2 years course schedule and Wharton's master degree schedule in

November 2024 so if she wanted "preparing a one-sentence research question and a short paragraph explaining its importance;" If she wanted the things that she stated, which is "For instance, we discussed preparing a one-sentence research question and a short paragraph explaining its importance so that you could begin connecting with other faculty (you expressed interest in meeting with others) and developing a summer research project of your own", then she should have told me to take AI course in education in the spring semester of 2025 instead of quantitative courses in the spring semester of 2025. She put me on the spot without advance notice, which is not fair to me.

**Point 13**

My core issue with my March 17, 2025 Zoom meeting with Professor Weathers is that she did not even let me know during the meeting that our last meeting will be on March 17, 2025. Many of the items that she complaint on her March 25, 2025 email was after our last meeting; so hypothetically speaking, even if these items are true, which they were not, she did not give me time to redeem them, and some of the items that she expressed concerns on her March 25, 2025 email were inaccurate description of my work with her. On April 2, 2025, she wrote, "Dear [John Doe], After careful thought and reflection, I have decided to step down as your advisor in the Education Policy program, effective April 2, 2025. I believe this is the best path forward for both of us given the concerns I previously expressed via email and the differences in our research agendas. The fit between advisor and advisee is a crucial aspect of doctoral training. I have discussed this decision with Michael Gottfried, Chair of the Education Policy program, both before and after reaching this conclusion. He is copied here in case you have any questions that I am unable to answer. With this change, you will need to identify a new advisor. Given your broadly stated interests in AI and STEM, I encourage you to reach out to

38

Drs. Bodong Chen, Susan Yoon, and Janine Remillard to explore potential alignment in research interests. They are aware you'll be contacting them and are open to speaking with you. Please note that although these faculty members are not based in the Education Policy program, they are still eligible to serve as your advisor. This change in advising does not affect your current enrollment in the Education Policy program. If you have any questions, would like to talk further, or need more ideas about potential advisors, please don't hesitate to reach out to me or Michael. Wishing you all the best, Ericka" (see doc 27).

**Point 15: Not handle correctly**

I want to cite my father's letter to Dear Vice Provost Jordan-Sciutto on January 7, 2026 regarding my matter. My father wrote to Vice Provost Jordan-Sciutto, "This termination letter was written by Chair Rand Quinn. Right after about 3 minutes the meeting ended by Zoom on December 18, Katharine forwarded Chair Quinn's email to my son's email. Chair Quinn and Professor Supovitz were not present in the meeting with my son's and Katharine's discussion. Chair Quinn wrote the termination letter without hearing my son's side of the story. They all were decided without hearing my son's side of the story." Also, I was doing homework assigned by my academic advisor, Professor Supovitz, for finding an AI expert during the Fall semester so Professor Supovitz did not get a chance to hear my side of the story.

**Point 18**

On October 29, 2025, Professor Isotani wrote, "When I share papers with you, I expect that you read them carefully and fully. In our first meeting, I sent several papers on how to conduct systematic literature reviews (SLR) and shared examples of published ones. However, it still seems that you are not fully familiar with the process or the expected deliverables. Please

revisit those papers so we can make meaningful progress." The issue that I have with this is that he assigned this assignment on August 29, 2025, which was about 50 days ago from the day he asked which was on October 23, 2025 (see doc 29). When he assigned this on August 29, 2025, he never reviewed them with me. Also, this is not what I agreed to do during my meeting with Professor Isotani; on my email on October 27, 2025 to Professor Isotani's contact person, Nam, I wrote, "I want to give you an update. Before meeting with Professor Isotani this past thursday, I was planning to follow what we discussed on October 9, which was that I examine titles and abstracts along with keeping 4 strings in mind (string one: ((LLM OR "large language model" OR ChatGPT OR "Google Gemini" OR Gemini OR DeepSeek) string two: ("personalized learning" OR "intelligent tutor" OR "pedagogical agent" OR "virtual agent" OR "smart learning environment") ; string three: (student OR child OR kid OR pupil); strong four: (benefit OR advantage OR drawback OR disadvantage)  from library databases to do a systematic literature review; so, I was planning to submit 10 articles for the week of October 13, and I was also planning to submit additional 10 articles for the week of October 20. And during the week of October 27, I was planning to submit 30-40 articles using the methods discussed on October 9. However, during the meeting with Professor Isotani this past Thursday, he wants me not to focus on the systematic literature review or the publication. Instead, Professor Isotani wants me to do a literature review with this specific research question that I discussed during this past Thursday's meeting: "Analyzing and categorizing evidence of the benefits and harms of LLMs in teaching and learning (e.g., cognitive offloading, attention loss, decrease in critical thinking, etc.)" (see doc 30). Imagine a professor gives an assignment to students during the first week of class, and never review for more than 50 days and 50 days later test students, and the professor does not let the students know they are being tested on information and surprise his/her students, and

whoever do not pass this test, they fail the course. This would not be fair to students. All of Professor Isotani's evaluation is referring to about one meeting on October 23, 2025.

**Point 19**

Also, On October 29, 2025, Professor Isotani wrote, "I also asked you to identify 10 key papers on AI + LLMs + personalized learning that can help to work on the search string for the SLR. You sent us the list, but you were not able to discuss their content in our last meeting (not a single paper)." This was not what Professor Isotani asked me during the meeting on October 23, 2025. Instead, during that meeting, Professor Isotani asked me to synthesize multiple articles on the spot and find common things among them; The major issue that I have with this is that this is not what I agreed to do during my meeting with Professor Isotani; on my email on October 27, 2025 to Professor Isotani's contact person, Nam, I wrote, "I want to give you an update. Before meeting with Professor Isotani this past thursday, I was planning to follow what we discussed on October 9, which was that I examine titles and abstracts along with keeping 4 strings in mind (string one: ((LLM OR "large language model" OR ChatGPT OR "Google Gemini" OR Gemini OR DeepSeek) string two: ("personalized learning" OR "intelligent tutor" OR "pedagogical agent" OR "virtual agent" OR "smart learning environment") ; string three: (student OR child OR kid OR pupil); strong four: (benefit OR advantage OR drawback OR disadvantage)  from library databases to do a systematic literature review; so, I was planning to submit 10 articles for the week of October 13, and I was also planning to submit additional 10 articles for the week of October 20. And during the week of October 27, I was planning to submit 30-40 articles using the methods discussed on October 9. However, during the meeting with Professor Isotani this past Thursday, he wants me not to focus on the systematic literature review or the publication.

Instead, Professor Isotani wants me to do a literature review with this specific research question that I discussed during this past Thursday's meeting: "Analyzing and categorizing evidence of the benefits and harms of LLMs in teaching and learning (e.g., cognitive offloading, attention loss, decrease in critical thinking, etc.)" (see doc 30). Also, during the meeting, he asked to do the powerpoint presentation, but I did not agree to do the powerpoint presentation on October 23, 2025 so he cannot hold me accountable for things I did not agree with.

Also, Professor Isotani does not provide clear instructions as to what he is looking for. Working with Nam who has only a master degree and Professor Isotani together creates difficulties because sometimes they do not align regarding task assignment.

5) **Breach of contract**

Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures (see doc 47). The institution made a specific promise (e.g., a specific appeal process) and failed to perform (see doc 61 under "e. GSE Student Academic Grievance Policy") .

According to Jennifer Reese in 2025, she wrote, "As part of your <u>apprenticeship</u> requirement, I am pleased to appoint you as a research fellow to" Professor Isotani." (see doc 51) According to Merriam-Webster dictionary, the definition of apprenticeship is "a position as an apprentice : an arrangement in which someone<u> learns</u> an art, trade, or job under another." I underline the word "learn" in the definition of apprenticeship because learning is an integral component of research apprenticeship; part of learning includes an opportunity of redeeming if a student did not do it perfectly. Working with professor Isotani, he does not an opportunity of redeeming, especially on October 23, 2025 where he asked several questions that we never

42

agreed to as you see in the previous emails mentioned in my appeal letter, and during the next meeting on November 4, 2025, I recall he did not ask the same questions that he asked on October 23, 2025.

Plaintiff's father wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, 2026, "I need to follow up regarding "GSE Student Academic Grievance Policy." According to "GSE Student Academic Grievance Policy", it says, "A GSE student who wishes to register a grievance on the evaluation of the student's academic work (for example, the appealing of a grade) or an academic matter related to the program or a course should discuss the situation with the faculty member first. If not satisfied, then the student should follow the order below in elevating the issue" (See doc 61)

Plaintiff's father also wrote to Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on March 10, 2026, "Most importantly, if the "GSE Student Academic Grievance Policy" only meant coursework, it would say "coursework." By adding "academic matter related to the program" in the "GSE Student Academic Grievance Policy," the policy encompasses the entire ecosystem of a student's degree progress.  (See doc 61) Therefore, my son's case should be considered in "GSE Student Academic Grievance Policy." Also, we are requesting the 4-step Grievance process. "GSE Student Academic Grievance Policy" has 4 steps at Penn GSE so this policy gives my son more opportunity to stay in the Ph.D. program and earn the Ph.D. degree, while "Exceptions to Academic Policies" has one step at Penn GSE. When my son signed "Formal Response and Reservation of Rights" on January 29, 2026, and sent this to your office, under section 4 in "Formal Response and Reservation of Rights," it said, "His objective remains unchanged: to complete the Ph.D. program and earn a Ph.D. degree at Penn GSE." My son maintains that the "Exceptions" track is procedurally inappropriate for a dismissal

43

based on research performance. We participate in the Exceptions track under express protest and without waiving our right to pursue the Grievance Policy track."

Plaintiff has initiated Step 1, Step 2, Step 3, and Step 4 of the GSE Student Academic Grievance Policy; however, Defendants have proceeded with dismissal in violation of their own internal procedures. Leslie M. Levin, Vice Dean of Admissions and Student Affairs at Penn GSE on April 8, 2026, "Dear [John Doe], I received your email from Wednesday, April 1st which states that you are initiating Step 3 of the GSE Student Academic Grievance Policy.  As I articulated in both my 3/12/26 and 1/29/26 emails, the appropriate process for addressing your appeal is the Exceptions to Academic Policies process.  The Committee on Degree will review this matter and issue a final determination.  We will be in touch with you once that decision is rendered." (see doc 47).

Also, attached Penn GSE's 4 year funding statement (see doc 43)

## II. Irreparable Harm

Overview: Academic dismissal is a career-ending event. The loss of unique research collaborations in AI and Education Policy cannot be compensated by money.

## 1. The Loss of Unique, Non-Fungible Academic Opportunity

The Third Circuit has recognized that the loss of a unique opportunity—particularly in a highly specialized academic or professional context—constitutes irreparable harm that money cannot remedy. Plaintiff's research involves the intersection of artificial intelligence, Large Language Models (LLMs), and public policy in education. This work is dependent on specific university resources, including access to high-performance computing clusters and ongoing

44

residency collaborations with faculty members in schools such as but not limited to Graduate School of Education and The Wharton School of the University of Pennsylvania. Plaintiff is in the joint program in Graduate School of Education and The Wharton School. Furthermore, this work is also dependent on ongoing residency collaborations with faculty members in other social science fields since Plaintiff's field is interdisciplinary.

Because Ph.D. research is inherently 'unique' and 'non-fungible,' a mid-stream termination of Plaintiff's enrollment is not merely a delay; it is a destruction of the specific intellectual environment and momentum required to complete Plaintiff's doctoral residency. No amount of future monetary damages can replicate the loss of these specific research windows or the collaborative synergy of Plaintiff's current residency.

## 2. Irreparable Stigma and Career "Death Sentence"

An academic dismissal from a doctoral program is a 'scarlet letter' within the professional and research community. If the University is permitted to finalize the 'Unsatisfactory' performance determination on Plaintiff's permanent transcript while the merits of Plaintiff's grievance are still in dispute, the damage to Plaintiff's professional reputation will be instantaneous and irreversible.

In the competitive field of AI and education research, a record of dismissal effectively bars a candidate from future fellowships, grants, and academic appointments. Even if Plaintiff were to prevail at a trial approximately two years from now, the interim stigma of 'dismissal' would have already permanently altered Plaintiff's career trajectory, making reinstatement a hollow victory."

45

### III. Balance of Equities

Overview: The hardship to Plaintiff—loss of career and health regression—far outweighs the minor administrative burden of maintaining Plaintiff's enrollment during the pendency of this litigation.

### Exacerbation of Health and "Status Quo" Preservation

The abrupt dismissal—conducted in violation of the University's own grievance procedures—has caused a documented and significant regression in Plaintiff's mental health, specifically Plaintiff's Major Depressive Disorder (MDD). The Third Circuit has held that the purpose of a Preliminary Injunction is to preserve the *status quo* to prevent further injury.

The *status quo* in this case is Plaintiff's continued enrollment and participation in the research residency. Allowing the University to upend this status quo before a final ruling would subject Plaintiff to a 'risk of health regression' and career displacement that far outweighs any administrative inconvenience to the University. The abrupt and procedurally deficient dismissal has caused a significant decline in Plaintiff's health, specifically exacerbating a documented Major Depressive Disorder (MDD). The ongoing stress of an uncertain academic future poses a risk of health regression that money cannot adequately remedy.

### IV. Public Interest

The public interest favors holding federally funded institutions to their published policies and protecting the rights of students with disabilities. Furthermore, the public has a strong interest in the advancement of ethical AI in education. Permitting the procedurally deficient removal of a researcher in this critical field harms not only the individual but the broader public

46

interest in educational innovation. The "Window of Research" Argument needs to be considered.

Since Plaintiff works with Large Language Models (LLMs) and Deep Learning, emphasize that

this field moves at an incredible speed. A one-year delay caused by a wrongful dismissal would

render Plaintiff's current research obsolete. This is "irreparable harm" because time in high-tech

research cannot be bought back.

## 3. Verified Complaint (Sworn Facts)

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this __29__ day of __May__ , 20__26__.

Signature of Plaintiff _____

Mailing Address __5424 Amboy Road__
__Staten Island, NY 10312__
_____

Telephone Number __347-213-3020__

Fax Number *(if you have one)* _____

E-mail Address __davex@upenn.edu__

Note:    All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also
         provide their inmate numbers, present place of confinement, and address.

## 4. Proposed Order

Under Fed. R. Civ. P. 65(b)(1) and (d), specific reasons for issuance in a TRO— the order

states the reasons why it should be granted (i.e., the factual and legal basis mentioned in the

amended motion).

Rule 65(d)(1)(C) requires the order to describe in reasonable detail the acts restrained. Plaintiff's injunctive clauses (paragraph 4) cover this.

Under Fed. R. Civ. P. 65(d)(1) and Rule 65(d)(2), defendants, parties, their officers, agents, servants, employees, attorneys, and others acting in active concert, and all persons acting in active concert or participation with them, are enjoined from: (a) terminating Plaintiff's enrollment; (b) revoking Plaintiff's academic access, computing privileges, or university email; (c) placing any notation of dismissal on Plaintiff's transcript; (d) removing Plaintiff from any sponsored research role or stipend. The Defendants are Katharine O. Strunk (Dean, Penn Graduate School of Education), Rand Quinn (Policy, Organizations, Leadership, and Systems Chair,  Penn Graduate School of Education), Susan Yoon (Associate Dean for Research and Faculty Affairs, Penn Graduate School of Education), Ericka S. Weathers (Assistant Professor, Penn Graduate School of Education), Seiji Isotani (Associate Professor,  Penn Graduate School of Education), Jonathan A. Supovitz (Professor of Education Policy and Leadership,  Penn Graduate School of Education), Michael A. Gottfried (Professor,  Penn Graduate School of Education), Lauren Rudick (Director, Student Intervention Services at University of Pennsylvania), and Leslie M. Levin (Vice Dean of Admissions and Student Affairs,  Penn Graduate School of Education).

The date and hour it was issued by the judge _____

The expiration date: The order expires at the time after entry — not to exceed 14 days — that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension.

48

The proposed order includes a line scheduling the preliminary injunction hearing within those 14 days.

_____

The bond amount: In the E.D. Pa., Plaintiff requests for a **waived or nominal bond** ($100). Plaintiff is a student with limited resources. Because the injunction merely maintains the status quo and imposes no financial cost on the University, the Court should waive the bond requirement.

Courts do have discretion to set a nominal bond in appropriate circumstances.

The Third Circuit has firmly established that district courts retain broad equitable discretion to waive the bond requirement or require only a nominal sum. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In the Third Circuit, it is well-established that the district court has broad discretion to waive the bond requirement or set a nominal amount under FRCP 65(c). Plaintiff explicitly cites the foundational cases establishing that this requirement is not strictly mandatory when equities dictate otherwise. **The Controlling Standard:** In *Temple University v. White*, 941 F.2d 201 (3d Cir. 1991), the Third Circuit recognized that there are exceptions to the bond requirement. Specifically, courts may waive the bond or require a nominal deposit when there is an "instance of public interest" or when requiring a substantial bond would effectively deny judicial relief to an indigent party. **The Balancing Test:** E.D. Pa. courts apply a balancing test to determine if a bond should be waived, weighing the financial hardship to the plaintiff against the potential financial harm to the defendant if the injunction is wrongfully issued.

49

In deciding whether to waive or minimize a bond, courts in this circuit must explicitly evaluate the relative equities and potential hardships, balancing "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991); see also *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (holding that a district court's failure to make specific factual findings regarding a movant's financial hardship constitutes reversible error).

A nominal bond of $100 is uniquely proper in this matter because a substantial bond would transform a procedural rule into an absolute barrier to equity, and because Defendant faces no risk of quantifiable monetary harm.

## A. Movant's Financial Hardship as a Student Acts as an Absolute Barrier to Equity

Courts within the Eastern District of Pennsylvania consistently recognize that where a plaintiff has strictly limited resources, enforcing a substantial bond requirement subverts the very purpose of equitable relief by denying access to the courtroom. *Cradle of Liberty Council, Inc. v. City of Philadelphia*, 2010 WL 744161, at *2 (E.D. Pa. Mar. 2, 2010) (noting that under *Temple University*, courts must weigh whether a bond requirement "would impose an undue financial hardship" or effectively deny judicial relief to an indigent party or one with limited means).

Movant is a second-year graduate student whose income is strictly limited. Movant possesses no independent capital assets, corporate reserves, or commercial revenue streams. If this Court conditions an urgent, status-quo-preserving injunction on a high financial security bond, Movant will be financially paralyzed and unable to post it. Under the *Temple University*

50

framework, when an applicant's limited economic means collide with a rigid application of Rule 65(c), the bond must be minimized to prevent financial hardship from functioning as a structural bar to constitutional or procedural due process. Because a heavy bond would render any victory on the merits entirely hollow by pulling the remedy out of Movant's financial reach, equity demands a nominal baseline.

## B. Maintaining the Status Quo Imposes No Quantifiable Monetary Harm on Defendant

The purpose of an injunction bond is to protect a defendant from clear, calculable financial damages sustained as a direct result of an erroneous injunction. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010). Thus, where an injunction merely freezes the parties in their current positions and does not compel affirmative capital expenditures or structural disruption, the risk of financial loss is near zero, and a nominal bond is legally sufficient. *Temple Univ.*, 941 F.2d at 220 (waiving bond where there was "virtually no risk" of financial loss to the enjoined party).

The relief requested in the proposed order is strictly prohibitory: it commands Defendant to preserve the administrative and academic status quo during the pendency of this litigation. Enjoining Defendant from altering Movant's current standing requires no out-of-pocket expenses, structural realignments, or commercial liabilities. Defendant has pointed to no operational revenue, market shares, or liquid assets that would be compromised by maintaining the status quo. Because Defendant faces no measurable exposure to financial injury, a nominal bond of $100 is "proper" under Rule 65(c) to satisfy the procedural posture of the motion without imposing a punitive burden on a student litigant.

51

Attached **Financial Hardship Affidavit** with Plaintiff's signature (see doc 66). The explicit factual record required by *Elliott v. Kiesewetter* to grant the waiver.

A nominal bond is highly appropriate when the injunction does not impose an affirmative operational or financial burden on the defendant, but instead merely freezes the parties in their current positions.

*E.D. Pa. Precedent:* Plaintiff cites *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) regarding the definition of the status quo. Furthermore, look to *Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996), which reinforces that the bond size should correspond to the actual likelihood and magnitude of potential monetary damages sustained by the defendant.

*Factual Application:*  Plaintiff argues that because the requested order strictly maintains the status quo and requires no capital expenditure or structural disruption from the Defendant, the risk of "costs and damages" under Rule 65(c) is virtually non-existent. Therefore, a $100 bond is mathematically and equitably "proper."

A line for the judge's signature_____

Name:

Date:

If notice was actually given, this is a noticed motion under Rule 65(a), not an ex parte TRO under 65(b).

Every TRO issued without notice must: state the date and hour it was issued

52

Date:_____and hour:_____

**Describe the injury and state why it is irreparable:**

The Third Circuit has recognized that the loss of a unique opportunity—particularly in a highly specialized academic or professional context—constitutes irreparable harm that money cannot remedy. Plaintiff's research involves the intersection of artificial intelligence, Large Language Models (LLMs), and public policy in education. Because Ph.D. research is inherently 'unique' and 'non-fungible,' a mid-stream termination of Plaintiff's enrollment is not merely a delay; it is a destruction of the specific intellectual environment and momentum required to complete  Plaintiff's doctoral residency. No amount of future monetary damages can replicate the loss of these specific research windows or the collaborative synergy of  Plaintiff's current residency.

An academic dismissal from a doctoral program is a 'scarlet letter' within the professional and research community. If the University is permitted to finalize the 'Unsatisfactory' performance determination on Plaintiff's permanent transcript while the merits of  Plaintiff's grievance are still in dispute, the damage to  Plaintiff's professional reputation will be instantaneous and irreversible.

The abrupt dismissal—conducted in violation of the University's own grievance procedures—has caused a documented and significant regression in Plaintiff's mental health, specifically  Plaintiff's Major Depressive Disorder (MDD). The Third Circuit has held that the purpose of a Preliminary Injunction is to preserve the *status quo* to prevent further injury.

**State why the order was issued without notice:**

Notice should not be further delayed because the University is scheduled to finalize my dismissal and terminate Plaintiff's academic access by May 18, 2026, and immediate judicial intervention is necessary to preserve the status quo.

The order must be promptly filed in the clerk's office and entered in the record.

Plaintiff stated that there is immediate and irreparable injury, loss, or damage that will result to the Plaintiff before the adverse party can be heard.

The Court finds that _____.

**5. CERTIFICATION OF NOTICE PURSUANT TO FED. R. CIV. P. 65(a)**

A.

Plaintiff sent the original motion and Redacted and Unredacted Exhibit #A, Redacted and Unredacted Exhibit #B, and Redacted and Unredacted Exhibit #C on **May 17, 2026, at [Time] about 11:30 PM  ET** to the University of Pennsylvania's Office of the General Counsel via email to Senior Vice President & General Counsel for the University of Pennsylvania & Penn Medicine (Wendy S. White), Deputy General Counsel for the University and Chief Counsel for Penn Medicine (Lee J. Dobkin), and paralegal (Patricia K. Colonna). After Plaintiff sent the original motion and Exhibit #A, Exhibit #B, and Exhibit #C via email on May 17, paralegal, Patricia K. Colonna from the University of Pennsylvania's Office of General Counsel replied via email.

54

As of May 29, 2026, the notice was provided for the Amended Motion for Preliminary Injunction to the University of Pennsylvania's Office of the General Counsel via email, not just the original motion.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time]about 11:32 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction via email to **[Insert Email Address, e.g., Nicole.Sugarman@ogc.upenn.edu, Patricia.Colonna@pennmedicine.upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time]about 11:34 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to the University of Pennsylvania's Office of the General Counsel via email to **[Insert Email Address, e.g., Nicole.Sugarman@ogc.upenn.edu, Patricia.Colonna@pennmedicine.upenn.edu]**.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:32 PM  ET** to the University of Pennsylvania's Office of the General Counsel via email to Associate General Counsel (Nicole Maltz Sugarman) and paralegal (Patricia K. Colonna) as mentioned above.

Plaintiff sent Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C on **May 29, 2026, at [Time] about 11:34 PM  ET** to the University of Pennsylvania's Office of the General Counsel via email to Associate General Counsel (Nicole Maltz Sugarman) and paralegal (Patricia K. Colonna) as mentioned above.

55

In the email on **May 29, 2026  at [Time] about 11:32 PM  ET** stated, "The amended motion replaces or supersedes the prior motion."

The documents that were sent to Associate General Counsel (Nicole Sugarman) and paralegal (Patricia K. Colonna) on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. After Plaintiff sent the Amended Motion for Preliminary Injunction, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C via email, Nicole Maltz Sugarman replied on May 30, 2026 via email.

B.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:37 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Katharine O. Strunk via email to **[Insert Email Address, e.g., kstrunk@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:38 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Katharine O. Strunk via email to **[Insert Email Address, e.g., kstrunk@upenn.edu]**.

The documents that were sent to Katharine O. Strunk on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:37 PM  ET** to Katharine O. Strunk as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Katharine O. Strunk replied or not]; **Katharine O. Strunk has not yet replied.**


C.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:41 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Rand Quinn via email to **[Insert Email Address, e.g., raq@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:42 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Rand Quinn via email to **[Insert Email Address, e.g., raq@upenn.edu]**.

The documents that were sent to Rand Quinn on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:41 PM  ET** to Rand Quinn as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Rand Quinn replied or not]. **Rand Quinn has not yet replied.**


D.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:44pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Susan A. Yoon via email to **[Insert Email Address, e.g., yoonsa@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:45pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Susan A. Yoon via email to **[Insert Email Address, e.g., yoonsa@upenn.edu]**.

The documents that were sent to Susan A. Yoon on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:44pm PM  ET** to Susan A. Yoon as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Susan A. Yoon replied or not]. **Susan A. Yoon has not yet replied.**

E.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:47 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Ericka S. Weathers via email to **[Insert Email Address, e.g., erickasw@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:48 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Ericka S. Weathers via email to **[Insert Email Address, e.g., erickasw@upenn.edu]**.

The documents that were sent to Ericka S. Weathers on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:47 PM  ET** to Ericka S. Weathers as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Ericka S. Weathers replied or not]. **Ericka S. Weathers has not yet replied.**


F.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:49 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Seiji Isotani via email to **[Insert Email Address, e.g., sisotani@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:50 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Seiji Isotani via email to **[Insert Email Address, e.g., sisotani@upenn.edu]**.

The documents that were sent to Seiji Isotani on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.


Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:49 PM  ET** to Seiji Isotani as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Seiji Isotani replied or not]. **Seiji Isotani has not yet replied.**

G.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:52 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Jonathan A. Supovitz via email to **[Insert Email Address, e.g., jons@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:53 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Jonathan A. Supovitz via email to **[Insert Email Address, e.g., jons@upenn.edu]**.

The documents that were sent to Jonathan A. Supovitz on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:52 PM  ET** to Jonathan A. Supovitz as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Jonathan A. Supovitz replied or not]. **Jonathan A. Supovitz has not yet replied.**

H.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:54 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction and Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Michael A. Gottfried via email to **[Insert Email Address, e.g., mgottfr2@upenn.edu]**.

The documents that were sent to Michael A. Gottfried on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:54 pm PM  ET** to Michael A. Gottfried as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Michael A. Gottfried replied or not]. **Michael A. Gottfried has not yet replied.**

I.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:56 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction and Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Lauren Rudick via email to **[Insert Email Address, e.g., rudickl@upenn.edu]**.

The documents that were sent to Lauren Rudick on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:56 PM  ET** to Lauren Rudick as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Lauren Rudick replied or not]. **Lauren Rudick has not yet replied.**

J.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:57 pm**, I provided notice of this **AMENDED** Motion for a preliminary injunction to Leslie M. Levin via email to **[Insert Email Address, e.g., lelevin@upenn.edu]**.

I, proceeding as John Doe, hereby certify that on **May 29, 2026, at [Time] about 11:58 pm**, I provided Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C to Leslie M. Levin via email to **[Insert Email Address, e.g., lelevin@upenn.edu]**.

The documents that were sent to Leslie M. Levin on **May 29, 2026** included the Amended Motion, Redacted Exhibit #A, Redacted Exhibit #B, and Redacted Exhibit #C.

Plaintiff sent the Amended Motion for Preliminary Injunction on **May 29, 2026, at [Time] about 11:57 PM  ET** to Leslie M. Levin as mentioned above and stated in the email, "The amended motion replaces or supersedes the prior motion."

A copy of the sent email, including all attachments, is included in my records. I request the recipient to acknowledge receipt. As of the time of this filing regarding the Amended Motion for Preliminary Injunction, [State if Leslie M. Levin replied or not:]. **Leslie M. Levin has not yet replied.**

Notice should not be further delayed because the University is scheduled to finalize my dismissal and terminate my academic access by May 18, 2026, and immediate judicial intervention is necessary to preserve the status quo.

## 5) CERTIFICATION OF NOTICE PURSUANT TO FED. R. CIV. P. 65(a)

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this __30__ day of ___May_____ , 20__26__.

Signature of Plaintiff _____
Mailing Address _5424 Amboy Road Staten Island, NY 10312_
Telephone Number _347-213-3020_
Fax Number *(if you have one)* _____
E-mail Address _davex@upenn.edu_

**6. Security / Bond (Rule 65(c))**

In the E.D. Pa., I request for a **waived or nominal bond** ($100).

Plaintiff is a student with limited resources. Because the injunction merely maintains the status quo and imposes no financial cost on the University, the Court should waive the bond requirement.

7.

Instead of hearing conducted via live, in-person, or virtual, Plaintiff requests written communication as a formal request for a "Reasonable Accommodation" due to Plaintiff's medical symptoms described. Most importantly, on February 18, 2026, Plaintiff was diagnosed with Major Depressive Disorder with somatic symptoms and stress-related muscle pain. Plaintiff has been taking daily medication Duloxetine and muscle relaxants.

8.
The amended motion replaces or supersedes the prior motion.

9.
If additional defendants are anticipated, the plaintiff reserves the right to seek amendment as the case develops.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JOHN DOE, Plaintiff,**

**v.**                                                    **CIVIL ACTION NO. 26-CV-3449**

**Katharine O. Strunk, Rand Quinn, Susan A. Yoon, Ericka S. Weathers,  Seiji Isotani, Jonathan A. Supovitz, Michael A. Gottfried, Lauren Rudick, and Leslie M. Levin, Defendants.**

**FIRST AMENDED motion**

---

# NOTICE OF DISCLOSURE OF PLAINTIFF'S IDENTITY

# (FILED UNDER SEAL)

Pursuant to the Plaintiff's contemporaneously filed *Motion for Leave to Proceed Under Pseudonym*, Plaintiff hereby provides notice to the Court and to the Defendants of his true identity.

1.  The individual proceeding in this matter under the pseudonym **John Doe** is:

**Plaintiff's Legal Identity:** Injun Lyo
**Permanent Residence:** [5424 Amboy Road, Staten Island, NY]
 Plaintiff requests court papers to be delivered at  Plaintiff's permanent residence address instead of temporary/academic residence address.

**Temporary/Academic Residence (if applicable):** 4070 haverford ave Apt 3A, Philadelphia, PA 19104
**Email for Service:** injunlyomore.space@gmail.com
**Student ID:** [Your UPenn ID #: 18248057]

2.  This disclosure is made for the limited purpose of identifying the party in interest to the Court and to counsel for the Defendants.

3.  Plaintiff respectfully requests that this document be maintained **under seal** and excluded from the public docket to preserve the privacy interests regarding Plaintiff's mental health history as detailed in the pending Motion for Leave to Proceed Under Pseudonym.

Plaintiff further clarifies that the exhibits attached to the Verified Complaint and Motion for TRO (Exhibits A through C) contain the name **Injun Lyo**. Plaintiff identifies as the individual named in those records. For the purposes of the public record, these names have been redacted to 'John Doe' or 'Plaintiff' to comply with the Motion for Leave to Proceed Under Pseudonym

67

| Exhibit # | Document Description | | Public Version (Redacted)<br><br>Page Range | Sealed Version (Original)<br><br>Page Range |
|---|---|---|---|---|
| | | | | |
| A | Supporting evidence for the brief for the federal court | | **Redacted** (Name hidden) (total of 71 pages)<br><br>page range: p.2 to p. 72<br><br>Contains doc 43 to doc 68 | **Original** (Name visible; **unredacted**) (total of 71 pages)<br><br>page range: p.230 to p. 300<br><br>Contains doc 43 to doc 68 |
| B | Main appeal letter that I submitted to Penn GSE in March 2026 | | **Redacted** (Name hidden) (total of 22 pages)<br><br>page range: p.74 to p. 95 | **Original** (Name visible; **unredacted**) (total of 22 pages)<br><br>page range: p. 302 to p. 323 |

| C | Supporting evidence for Main appeal letter that I submitted to Penn GSE in March 2026 | | **Redacted** (Name hidden) (total of 132 pages)<br><br>page range: p.97 to p. 228<br><br>(doc 1 to doc 31) | **Original** (Name visible; **unredacted**) (total of 132 pages)<br><br>page range: p. 325 to p. 456<br><br>(doc 1 to doc 31) |

69

**Part A: The Public Binder (The "Open" Stack)**

This stack is not in an envelope. It is for the public file.

- **Contents:** Motion for TRO, Motion for Pseudonym, Redacted Complaint, and the Redacted Exhibit Bundle.
- **Labeling:** The top page of the exhibits should be your **Exhibit Index**, clearly marked "REDACTED PUBLIC VERSION."

**Part B: The Sealed Envelope (The "Hidden" Stack)**

This must be inside a **large, secured manila envelope**.

- **Contents:** The *Notice of Disclosure of Plaintiff's Identity*, the original Verification page (with your real signature), and the **Unredacted (Original) Exhibit Bundle**.
- **Labeling:** The outside of the envelope **must** have the case caption and a label in bold:

  **"CONFIDENTIAL: DOCUMENTS TO BE FILED UNDER SEAL PURSUANT TO CONTEMPORANEOUS MOTION TO PROCEED UNDER PSEUDONYM."**

Acknowledgement: I utilized Google Gemini to expand legal terms, expand my legal ideas further, and structure this document.